**READING & BATES CORPORATION
and Subsidiaries, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 94–1012 T.

United States Court of Federal Claims.

March 20, 1998.

John W. Porter, Houston, TX, for plaintiff. Stanley C. Beyer, and Richard A. Husseini, Houston, TX, of counsel.

Thomas D. Sykes, Washington, DC, with whom were Assistant Attorney General Loretta C. Argrett, Mildred L. Seidman, and David C. Gustafson.

## ORDER

MOODY R. TIDWELL, III, Judge.

This case is before the court on plaintiff's motion for partial summary judgment and defendant's motion for partial summary judgment and to dismiss. The parties have agreed to settle several issues originally before the court, leaving two issues, identified by the parties as the "Western Desert Contract Income Issue" and the "Bad Debt Deduction Issue," subject to the pending motions. As both parties have noted, these issues are extraordinarily complex. For the reasons set forth below, the court grants in part and denies in part defendant's motion for partial summary judgment, grants in part and denies in part plaintiff's motion for partial summary judgment, and stays defendant's partial motion to dismiss.

## FACTS

### I. Western Desert Contract Income Issue

#### A. The WEPCO Drilling Contract

In September of 1975, plaintiff, through a subsidiary, Reading & Bates Drilling Company ("RBDC"), entered into a contract with Western Desert Operating Petroleum Company ("WEPCO"), an Egyptian corporation, to drill wells in search of oil and gas in Egypt. The drilling contract included the following indemnification provision:

> Any and all taxes whether corporate or personnel imposed by Egyptian Authorities shall be at the Operator's [WEPCO's] charge and responsibility with the exception of personnel taxes imposed on local personnel. The Contractor [RBDC] will provide the Operator with the data and documentation needed for settlement of local taxes, for corporate or personnel.

(Def.'s App. at B537; Pl.'s Ex. E.)[1] Plaintiff interpreted this provision to mean that WEPCO would challenge any tax imposed on RBDC that was contrary to fact or Egyptian law and satisfy any tax obligation falling within the agreement.

## B. Plaintiff's Egyptian Tax Returns

Plaintiff performed under the WEPCO contract throughout 1976 and 1977. On March 24, 1977, RBDC filed an Egyptian tax return (1976 Egyptian Return) for the period from the date of commencement to September 30, 1976, reporting no tax liability. Plaintiff's records indicate that RBDC reported net losses for the period of LE 394,-689.[2] On February 27, 1978, RBDC filed an Egyptian tax return (1977 Egyptian Return) for the period from January 10, 1976, through September 30, 1977, reporting no tax liability. Plaintiff's records indicate that RBDC reported net losses of LE 260,245 for the period.

In 1981, the Egyptian government began an audit of RBDC's 1976 and 1977 Egyptian tax returns. On December 23, 1981, the Egyptian Tax Authorities adjusted RBDC's 1976 return, in summary, reducing depreciation expenses by LE 536,373 and increasing total revenue by LE 98,625. These adjustments resulted in additional Egyptian taxes for the 1976 taxable year of $ 1,001,078. The Egyptian tax authorities also adjusted plaintiff's 1977 return, in summary, reducing depreciation expenses by LE 634,636 and increasing total revenues by LE 34,888. Revisions to plaintiff's 1977 return resulted in additional Egyptian tax liability for the period of $ 1,171,313.

Pursuant to its contractual obligation, WEPCO appealed this decision on behalf of RBDC.[3] The appeal was heard by the Internal Tax Committee of the Alexandria Tax Contestation Committee of Egypt on July 27, 1982. The case was ultimately transferred to the Higher Tax Committee of the Alexandria Taxation Committee (Higher Tax Committee). Hearings were held on October 13, 1982, December 13, 1982, April 16, 1983, May 25, 1983, and April 23, 1984. On May 5, 1984, the Higher Tax Committee ruled that plaintiff was liable for an additional $ 679,388 for the 1976 Egyptian Tax Return and $ 875,-196 for the 1977 Egyptian Tax Return. Pursuant to the drilling contract, WEPCO made payments on this liability on August 29, 1984, September 9, 1984, October 25, 1984, November 25, 1984, and December 24, 1984. Plaintiff received final confirmation of these payments on January 9, 1985.

## C. Plaintiff's U.S. Federal Tax Returns

In June of 1977, plaintiff filed its federal corporate income tax return for the taxable year ending September 30, 1976 (1976 Federal Return); in June of 1978, plaintiff filed its federal tax return for the taxable year ending September 30, 1977 (1977 Federal Return); and on October 27, 1978, plaintiff filed its federal tax return for the shortened tax year ending December 31, 1977 (Shortened 1977 Federal Return). Plaintiff did not report income realized from the WEPCO Indemnification Payments in any of these returns.

The IRS audited plaintiff's returns for 1976–1981, ultimately adjusting plaintiff's taxable income for its 1976 taxable year to include the payment of $ 679,388 in 1976 Egyptian corporate taxes made on plaintiff's behalf by WEPCO, and adjusting plaintiff's income for its 1977 taxable year to include the payment of $ 875,196 in 1977 Egyptian corporate taxes made on plaintiff's behalf by WEPCO. Adjustments to plaintiff's 1976 return resulted in an increase in the amount of foreign tax credit "carry-backs" that plaintiff utilized in the taxable year ending September 30, 1976. Adjustments to plaintiff's 1977 re-

---

1. Citations to defendant's consecutively paginated two-volume appendix to its motion for partial summary judgment are indicated by "App." and "B" followed by a page number. Citations to plaintiff's exhibits to proposed findings of uncontroverted facts are indicated by "Ex." and the exhibit letter. Some material may be found in both parties' appendices.

2. Amounts herein stated in Egyptian pounds are indicated by "LE" i.e. "LE 394,689." Amounts given in U.S. dollars are indicated by the symbol "$." Plaintiff's accountant indicates that the applicable exchange rate in 1976 and 1977 was LE 1 = $ 2.55555.

3. Egyptian law apparently permitted WEPCO to appeal the decision before paying the deficiency.

turn resulted in an increase in plaintiff's taxable liability for the fiscal year ending September 30, 1977. These adjustments also impacted plaintiff's taxable liability in later years.

On December 23, 1992, plaintiff filed amended returns for each tax year from 1976 through 1981. These amended returns involve "a highly complex flow of foreign tax credit and investment tax credit carry-overs and carry backs" including plaintiff's claim to a foreign tax credit against its 1976 and 1977 U.S. tax liability for the Egyptian taxes paid by WEPCO.[4] (Plaintiff's First Amended Complaint ¶ 9) (amending ¶ 13). Plaintiff claimed that it was entitled to refunds for the taxable years ended September 31, 1976, September 31, 1977, December 31, 1979, and December 31, 1980. Plaintiff's amended returns showed no change in tax liability for the period ended December 31, 1977, and additional tax due for the periods ended December 31, 1978, and December 31, 1981. The Internal Revenue Service reviewed plaintiff's amended returns and allowed plaintiff's claimed foreign tax credit for the 1976 and 1977 Egyptian taxes paid by WEPCO, but adjusted plaintiff's 1976 and 1977 U.S. taxable income to reflect payment of the Egyptian taxes by WEPCO.

On February 24, 1993, the District Director of the Internal Revenue Service in Austin, Texas, disallowed plaintiff's remaining claims. This suit followed.

## II. Bad Debt Deduction Issue

### A. Plaintiff's Iranian Operations

In August of 1975, plaintiff, through its subsidiary, Reading & Bates Offshore Drilling Company ("RBODC"), entered into an agreement with the Industrial Mining and Development Bank of Iran ("IMDBI"), to form a private Iranian joint stock company under the name of Irano–Reading & Bates, S.S.K. (IRB).[5] IRB issued common and preferred stock having no par value. All of the preferred stock and fifty-percent of the common stock were held in equal amounts by Reading & Bates Drilling Co., Reading & Bates Drilling Limited, Reading & Bates, Inc., and Reading & Bates Corporation, as nominees for Reading & Bates Exploration Co. ("RBX"), a wholly owned subsidiary of plaintiff. Fifty percent of IRB's common stock was held by IMDBI. Nine land drilling rigs and one offshore drilling rig were subsequently transferred from RBX to IRB.

IRB's operations were managed by a four-member board of directors; two directors represented Reading & Bates and two directors represented IMDBI. A majority vote of the directors was required for any action taken by the board. Reading & Bates, however, ostensibly controlled IRB through its right to appoint IRB's Managing Director.

IRB's principal customer was Oil Service Company of Iran ("OSCO"). Effective June 29, 1977, IRB entered into a contract with OSCO to provide drilling services and "well workover operations" for OSCO in Iran.

On November 17, 1977, RBX acquired two land drilling rigs from IRB for $ 6,611,943.51. On April 7, 1978, RBX acquired one offshore drilling rig from IRB for $ 8,776,203.72. The purchase agreements accompanying these transactions contained the following clause:

> In payment of the purchase price, Buyer [RBX] hereby assumes, as between Buyer and Seller [IRB] only, the obligations of Seller with respect to U.S. [$ 6,611,943.51 *and* $ 8,776,203.72] of the outstanding [amount *and* principal] owed by Seller to the Industrial Mining Development Bank of Iran [pursuant to the terms and conditions of that *and* under the] U.S. $ 30,-000,000 Complimentary Loan Agreement between Seller, Industrial and Mining Development of Iran, and Bank Melli Iran. At the request of Seller, Buyer agrees to make payments to the Industrial and Mining Development Bank of Iran, [on behalf of Seller,] of Buyer's pro rata share of the

---

4. Plaintiff's amended returns included claims no longer before this court.

5. The Pahlavi Foundation, a foundation closely associated with Shah Mohammad Reza Pahlavi,

was the principal shareholder in IMDBI. *See Continental Illinois Corporation v. Commissioner*, 94 T.C. 165, 166, 1990 WL 17257 (1990).

interest, and the U.S. [$ 6,611,943.51 *and* $ 8,776,203.72] after the first U.S. [$ 14,-611,852.77 *and* $ 21,233,796.28] of the original amount borrowed by Seller under such loan agreement has been repaid, as and when due under such loan agreement. Seller shall have no recourse against Buyer hereunder, except with respect to Buyer's right, title and interest in and to such drilling equipment, and to any proceeds or notes received from the sale of such drilling equipment hereafter.

(Def.'s App. at B635, B640; Pl.'s Ex. L) (discrepancies noted in brackets.) RBX sold the land rigs on February 5, 1978, and the offshore rig on April 7, 1978, to RBI Drilling Limited ("RBI") for the same price as RBX originally agreed to pay IRB. RBI was a partnership, owned fifty percent by Reading & Bates Drilling Co., an affiliate of plaintiff, and fifty percent by Sanati Corporation, a Netherlands Antilles corporation owned by IMDBI or one of its affiliates. This sale included purchase agreements and promissory notes in the amount of the purchase price, issued to RBX on February 5, 1978, and April 7, 1978. The promissory notes each contained the following language:

> For the value received, RBI Drilling Ltd., a Texas U.S.A. joint venture comprised of Sanati Corporation, N.V., a Netherland [sic] Antilles corporation, and Reading & Bates Drilling Co., an Oklahoma, U.S.A. corporation, promises to pay to Reading & Bates Exploration Co., an Oklahoma, U.S.A. corporation, at 1200 Milam, Suite 3200, Houston, Texas, U.S.A., the sum of [$ 6,611,943.51 *and* $ 8,776,203.72], with interest thereon from [November 17, 1977, *and* April 7, 1978] [until repaid] at the rate in effect from time to time under that U.S. $ 30,000,000 Complementary Loan Agreement between Irano–Reading & Bates Private Joint Stock Company, Industrial Mining and Development Bank of Iran, and Bank Melli Iran. The principal amount of this note shall be due and payable as and when the last U.S. [$ 15,388,147.23 *and* $ 8,776,203.72] of principal becomes due

and payable under such loan agreement. This promissory note is subject to the terms and conditions of the Purchase Agreement dated as of February 5, 1978 between RBI Drilling Ltd. and Reading and Bates Exploration Co.[6]

(Pl.'s Ex. L; Def.'s App. at B639, B644) (discrepancies noted in brackets.) The February 5, 1978, purchase agreement contained the following language:

> Buyer acknowledges the existence of a mortgage given by Irano–Reading & Bates Private Joint Stock Company in favor of Industrial Mining and Development Bank of Iran and Bank Melli, which mortgage is registered on page 1909 of the Register No. pf of the Representative of the Registration Office, under No. 137407 of the Registry of Notary Public No. 2, Tehran, Iran on August 27, 1975. Buyer agrees that its rights with respect to the personal property covered by this Agreement are subject to the rights of the mortgagee/s under such mortgage. Buyer agrees to defend and indemnify Seller from any and all costs or expenses which may be incurred by Seller as a result of rights asserted by the mortgagee/s under the above-described mortgage which arise in whole or in part, as a result of Buyer's failure to meet its obligations hereunder. Except for the mortgage described above, Seller warrants that the personal property covered by this Agreement is free from any security interest, lien or encumbrance.

(Def.'s App. at B637–B638; Pl.'s Ex. M.) In a document dated April 3, 1978, representatives of Reading and Bates Offshore Drilling Company, RBI Drilling, Ltd., IMDBI, and Sanati signed an agreement summarizing the obligations of the parties involved. The following provisions are taken from this agreement:

> On October 10, 1977, the Board of Directors of IRB accepted a proposal agreed to by IMDBI and RBODC for IMDBI to provide financing to IRB on an interest-bearing advance basis through 1985....

---

6. The April 7, 1978, promissory note's reference to the February 5, 1978, purchase agreement, rather than the April 7, 1978, purchase agreement is not explained in the record. As both notes and purchase agreements are virtually identical, the court does not see significance in this apparent deviation.

This proposal called for cash advances by IMDBI to IRB which could total up to $ 7,171,000 by 1983 providing that RBODC's advances to IRB totaled at least $ 7,171,000 at that time. The purpose of these advances which are to begin on September 30, 1978, is to equalize IMDBI's and RBODC's relative cash positions with respect to IRB's October 10, 1977, forecasts.

. . . .

1. RBX will have assumed approximately $ 15,500,000 of IRB's remaining $ 24,500,000 Eurodollar–IMDBI debt in connection with the purchase of Rigs 30, 31 and 63. RBX will pay *directly* to IMDBI the interest on its share of the Eurodollar debt as well as the last $ 15,000,000 of the principal which is due in payments of $ 5,000,000 each in 1980, 1981 and 1982. An additional partial payment of about $ 500,000 may be due in 1979 according to the final exact purchase price of the rigs.

2. RBI will pay interest and principal to RBX according to promissory notes issued in connection with the purchase of Rigs 30, 31 and 63.

3. In the spirit of the October 10, 1977, agreement between RBODC and IMDBI, IMDBI will advance to IRB the following amounts as agreed, assuming that the consolidated advances of RBODC to IRB and RBI (including any amounts by which RBX's principal payments on the assumed Eurodollar obligation exceed RBI's principal payments to RBX against the promissory notes) are at least equal to the amounts noted in the *Cumulative* column shown on the following page.

. . . .

The intent of the foregoing is to assure that the October 10, 1977, agreement applies to the consolidated financial positions of both IRB and RBI.

4. RBODC either has advanced or will continue to advance to IRB and/or RBI (including any amounts by which RBX's principal payments on the assumed Eurodollar obligation exceed RBI's principal payments to RBX against the prom-

issory notes) up to $ 7,171,000 on an "as needed" basis in order to fund ongoing operations.

5. In the event IRB accumulates sufficient cash after satisfying its own Eurodollar debt payments, IRB will in the following order of priority (1) loan money to RBI to help satisfy its RBX note obligations; (2) resume repayments of its $ 7.5 million loan from IMDBI, the balance of which now stands at $ 6,750,000; and (3) repay IMDBI and RBODC their respective advances in proportion to the advances outstanding at the time.

It is the understanding and intention of the parties to this agreement that IRB does remain ultimately liable on the portion of the Euro–dollar–IMDBI debt assumed by RBX. It is also understood and intended by the parties that in the event of default by RBX of its obligations under the assumption of the Eurodollar–IMDBI debt, IRB's recourse against RBX is limited to RBX's rights, title and interest in and to its notes receivable from RBI.

(Def.'s App. at B646–B647.)

On October 17, 1978, RBI, IRB, IMDBI, and RBODC, signed an agreement acknowledging the transactions involving the rigs and the IMDBI mortgage on the rigs. In this agreement, the parties agreed that, until the mortgage was repaid, RBI would not dispose of the rigs other than to IRB.

In November of 1978, OSCO ceased paying invoices to IRB, but directed that all land drilling operations continue. IRB continued to operate its land rigs in accordance with its OSCO contract. By this time, IRB was in financial distress.

## B. Political Events in Iran

Plaintiff and defendant entered a partial stipulation as to facts surrounding the Iranian Revolution. The following is a summary of those facts that are relevant to the court's analysis.

In 1977, Shah Mohammad Reza Pahlavi, relaxed Iranian censorship law, permitting a flood of anti-government material and triggering widespread demonstrations against the Iranian dictatorship. Ayatollah Ruhollah

Khomeini, living at that time in exile in Iraq, became the de facto leader of the revolutionary movement. Khomeini attributed Iran's problems to the influence of foreign, particularly American, interests. Khomeini would eventually attempt to rid Iran of American influence by seizing control of American companies doing business in Iran.

In January of 1978, students in Qum, Iran, protesting the forced exile of Ayatollah Khomeini, were shot by Iranian police. Forty days later, protestors, commemorating the death and martyrdom of the slain students, were also shot, and a cycle of violence began. In October of 1978, revolutionary leaders began organizing strikes. On October 31, 1978, Iran's oil workers went on strike. In November, as violent demonstrations and strikes plagued Iran, the Shah turned to the military to force strikers back to work and restore order. On November 8, 1978, the Iranian government stopped foreign currency exchanges to halt the flow of money out of Iran.

Ayatollah Khomeini, forced from Iraq, gained even greater prominence living in exile in France. Khomeini attributed Iran's problems to foreign interests and advocated renegotiation of all contracts with foreigners. On November 12, 1978, leaders of the revolution vowed to use strikes to overthrow the government. Religious leaders called a one-day general strike, and an estimated one million people marched in protest of the Shah.

In December of 1978, Paul Grimm, Assistant Managing Director of OSCO, was assassinated. Recognizing the danger facing American citizens, all OSCO and IRB expatriates left Iran by December 31, 1978. Violent clashes continued to claim lives throughout Iran.

On January 11, 1979, Prime Minister Shahpur Bakhtiar promised to end the strikes and expel unnecessary or unauthorized foreign workers. On January 16, 1979, the Shah fled Iran, leaving his "Regency Council" and Prime Minister Bakhtiar in charge. On January 30, 1979, the U.S. government ordered the evacuation of all American dependants and all nonessential personnel.

Ayatollah Khomeini returned to Iran on January 31, 1979. On February 1, 1979, Khomeini stated that he hoped God would cut off the hands of all foreigners. The following day, U.S. Air Force planes flew to Tehran to evacuate the remaining 8500 Americans in Iran. On February 5, 1979, Khomeini announced that Mehdi Bazargan would be prime minister of a provisional Islamic government. On February 11, 1979, Prime Minister Bakhtiar and the Iranian Parliament resigned. Prime Minister Bakhtiar fled Iran on February 12, 1979.

Marxist guerrillas attacked the U.S. Embassy in Tehran on February 14, 1979, and held more than 100 people, including the Ambassador, hostage for about two hours. Khomeini's forces eventually disbursed the attackers. The U.S. Embassy announced that it could no longer protect American lives in Iran and urged all Americans to leave the country. On February 16, 1979, the U.S. Ambassador re-affirmed the United States' intention to maintain diplomatic relations with the government of Iran.

The fall of the Shah led to more than an upheaval in the political and strategic alliance between the United States and Iran; it strained and ultimately broke an entire range of economic relationships that had developed between the countries. These relationships ranged from oil field services, petroleum, banking, military equipment, construction, manufacturing, and consumer goods.

On February 19, 1979, Prime Minister Bazargan attempted to spur militant oil field workers back to work by reporting that if Iranian oil was not exported and sold, the Iranian revolution would fail. The chairman of the National Iranian Oil Company ("NIOC") visited Iran's oilfields in an effort to promote the resumption of oil exports. He announced that Iran planned to rehire foreign oil workers and produce 60 percent of its former output.

On March 1, 1979, Khomeini moved his headquarter to Qum, and called for the creation of an Islamic republic. He rejected a democratic republic because it would be Western oriented. On March 3, 1970, the newly appointed Governor of Iran's Central

Bank announced that Iran would honor all foreign debts. Iran resumed oil exports on March 6, 1979, after a ten week hiatus.

In a nationwide referendum, held on March 30–31, 1979, Iranians endorsed Khomeini's Islamic republic. On April 1, 1979, Khomeini declared the Islamic Republic of Iran and warned that vestiges of the Shah's "stinking regime" were still active in the country, with the support of "international oil thieves and parasites." On April 30, 1979, NIOC announced the signing of 35 contracts with foreign oil companies to supply about 2.3 million barrels per day, and that an additional 20 contracts were under negotiation that would bring exports to 3 million barrels per day.

The ascendency of Khomeini did not halt foreign business, particularly oil production, in Iran. In February of 1979, the Federal Reserve Board of New York decided to honor payment instructions from the new officials of the Iranian central bank. Commercial banks in the U.S. followed suit. In the Spring of 1979, the U.S. government cautiously advised companies to resume business relations with Iran. American policy was designed to promote stability in Iran by maintaining diplomatic and economic relations with the revolutionary government. From March to November of 1979, Iran's oil sales to the U.S. were maintained at or about pre-revolution levels. Major American corporations slowly resumed operations in Iran. Anti–American sentiment, however, was slow to dissipate.

All banks in Iran, including IMDBI, were nationalized by the Islamic government of Iran on June 8, 1979. On June 25, 1979, all insurance companies were nationalized and the government seized the foreign assets of seven firms. On July 4, 1979, IRB attempted to secure permission to export seven land rigs owned by IRB. Permission was denied. On July 5, 1979, Iran nationalized the steel, copper, aluminum, aircraft, shipbuilding, automobile, and mining industries.

The period leading up to the hostage crisis was a difficult one for those doing business in Iran. Some contracts and agreements were blatantly breached by Iran; some were made impossible to perform; and others were left in limbo. Debt payments were often late, and the long-range security of those obligations was uncertain.

On October 22, 1979, the exiled Shah traveled to the United States for medical treatment. His visit rekindled anti-American sentiment in Iran. On October 28, 1979, Khomeini recommenced his rhetorical attack on the evils of American influence, and, on November 2, 1979, called on his supporters "to expand with all their might the attack against the United States." On November 4, 1979, about 500 protestors responded by entering the U.S. Embassy compound in Tehran and seizing approximately 100 hostages, including 65 Americans. The attackers demanded that the U.S. extradite the Shah.

The occupation of the American Embassy and the taking of hostages was supported by Khomeini. Khomeini viewed the United States as the source of sinister Western influence that had diverted Iran from the path of Islamic purity. The eradication of ties with the West and the establishment of an Islamic state were central tenants of the Iranian Revolution. The taking of American hostages served both purposes.

The Iranian government was in a state of disarray. Political struggles within Iran complicated negotiations for the release of the hostages. On November 6.1979, Prime Minister Bazargan and his cabinet resigned and Khomeini appointed a Revolutionary Council to manage the government.

American policy in dealing with the hostage crisis was driven by two overriding objectives: 1) the protection of the honor and vital national interests of the United States; and 2) the protection and well-being of the hostages and their safe release. On November 6, 1979, the U.S. sent emissaries to Iran to seek the release of the hostages. Khomeini refused to meet with the representatives and they returned to the United States. On November 7, 1979, Khomeini forbade Iranian officials from speaking with American representatives. The U.S. State Department again advised all Americans in Iran to leave the country.

In the Fall of 1979, the Carter administration began to develop a plan to freeze Iranian

assets within the jurisdiction of the United States. On November 12, 1979, President Carter ordered a prohibition on oil imports from Iran. On November 14, 1979, the Iranian government indicated its intention to withdraw all Iranian assets from the United States. Pursuant to the International Emergency Economic Powers Act, 91 Stat. 1626–1628 (1977) (current version at 50 U.S.C. §§ 1701–1706 (1994)), President Carter declared a national emergency and, by executive order, froze all property and property interests of the Government of Iran within the jurisdiction of the United States. The executive order implementing the freeze provided:

### BLOCKING IRANIAN GOVERNMENT PROPERTY

Pursuant to the authority vested in me as President by the Constitution and laws of the United States including the International Emergency Economic Powers Act, 50 U.S.C.A. § 1701 et seq., the National Emergencies Act, 50 U.S.C. § 1601 et seq., and 3 U.S.C. § 301, I, Jimmy Carter, President of the United States, find that the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and hereby declare a national emergency to deal with that threat.

I hereby order blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States or which are in or come within the possession or control of persons subject to the jurisdiction of the United States.

The Secretary of the Treasury is authorized to employ all powers granted to me by the International Emergency Economic Powers Act to carry out the provisions of this order.

This order is effective immediately and shall be transmitted to the Congress and published in the Federal Register.

Exec. Order No. 12170, 3 C.F.R. § 457 (1980), reprinted in 50 U.S.C. § 1701 n. at 190–191 (1994). The President notified Congress of the freeze as follows:

The circumstances necessitating the exercise of this authority are the recent events in Iran and the recent actions of the Government of Iran.... These events and actions put at grave risk the personal safety of United States citizens and the lawful claims of United States citizens and entities against the Government of Iran and constitute an extraordinary threat to the national security and foreign policy of the United States.... Consequently, I have ordered blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States or which are or come within the possession of persons subject to the jurisdiction of the United States.... Blocking property and property interests of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran will enable the United States to assure that these resources will be available to satisfy lawful claims of citizens and entities of the United States against the Government of Iran.... This action is taken with respect to Iran for the reasons described in this report.

15 Presidential Documents (Part 2) 2117 (Nov. 14, 1979). In retrospect, many analysts have concluded that the true reasons for the freeze were more complex. Many believe that the freeze was an effort to obtain leverage to pressure the release of the hostages. The administration's response was also motivated by domestic political realities. Internationally, the economic rationale for the freeze was necessary to alleviate concerns that foreign assets in America were subject to political seizure.

On November 15, 1979, the Treasury Department issued regulations implementing the freeze:

No property subject to the jurisdiction of the United States or which is in the possession of or control of persons subject to the jurisdiction of the United States in which on or after the effective date Iran has any interest of any nature whatsoever may be transferred, paid, exported, with-

drawn or otherwise dealt in except as authorized.

Unless licensed or authorized pursuant to this part, any attachment, judgment, decree, lien, execution, garnishment or other judicial process is null and void with respect to any property in which on or since the effective date there existed an interest in Iran.

31 C.F.R. § 535.203(e) (1980). The regulations provided any license or authorization granted could be "amended, modified, or revoked at any time." 31 C.F.R. § 535.805. On November 26, 1979, the Treasury issued a general authorization to permit judicial proceedings against Iran but prevented the "entry of any judgment or of any decree or order of similar or analogous effect...." 31 C.F.R. § 535.504(b)(1). On December 19, 1979, the regulations were amended to clarify that the "general authorization for judicial proceedings ... include[d] pre-judgment attachment," but prohibited any payment or transfer of frozen assets. 31 C.F.R. § 535.418.

Iran's initial list of demands for the release of the hostages were: (1) admit that the property of the Shah was stolen; (2) cease interference in Iranian affairs; and (3) extradite the Shah to Iran for a fair trial. The demands were subsequently modified to: (1) the return of the Shah's assets; (2) the end of interference in Iran's affairs; and (3) an apology for past U.S. "crimes" against Iran. The United States responded that its courts were open to Iran to pursue the Shah's wealth; that the United States would not intervene in Iranian affairs; and that it would make no apology for so-called "crimes."

On November 17, 1979, the United States transmitted a four point basis for ending the crisis through U.N. Secretary General Waldheim. The Waldheim settlement proposed: (1) release of the hostages; (2) establishment of an international commission to inquire into human rights violations under the Shah; (3) making the U.S. Courts available for claims for the return of the Shah's assets; and (4) affirmation of international law by both countries.

On November 25, 1979, Iran announced that it would not repay its foreign debts. The United Nations passed Resolution 457 on December 4, 1979, calling for the release and return of the hostages, the peaceful settlement of differences between Iran and the United States, and the Secretary General to assist in resolving remaining issues. The United States accepted the resolution, but Iran rejected it. The State Department expelled all but 35 Iranian diplomats from the United States on December 12, 1979, in light of the continued illegal detention of American personnel in Tehran. The Iranian government threatened to try the hostages for espionage. On December 15, 1979, the International Court of Justice issued an interim order that Iran should immediately release the hostages and return the U.S. Embassy to American control. Iran rejected the court's order.

On December 27, 1979, the Soviet Union invaded Afghanistan. The invasion transformed the strategic environment in the region and encouraged a negotiated settlement. The United States amended its four point offer to include its willingness to seek a resolution of all issues between the United States and Iran in accordance with the U.N. charter. On December 31, 1979, Secretary General Waldheim traveled to Iran to attempt to negotiate a settlement. The Iranian officials Waldheim met stated that any attempt to win the release of the hostages would be futile.

On January 13, 1980, the United States further expanded the Waldheim points to include development of a U.N. Commission of Inquiry to hear Iran's grievances. The United States indicated that once the hostages were released, the freeze would be lifted based upon the understanding that Iran would meet its financial obligations to U.S. nationals and that arrangements would be made to protect the interests of U.S. banks and other claimants. Iran did not respond to this proposal.

Efforts to obtain a diplomatic solution were thwarted by internal power struggles within Iran. On April 7, 1980, the United States formally broke off diplomatic relations with Iran. All Iranian diplomats were ex-

pelled from the United States. President Carter announced that a formal inventory of Iran's frozen assets and of outstanding claims would be conducted.

On April 11, 1980, the failed diplomatic efforts, deteriorating security situation in Iran, seasonal weather considerations, and indications that the hostages would not be released until an Iranian Parliament was formed, led to President Carter's decision to resort to a military solution. On April 25, 1980, a mission to rescue the hostages ended in disaster.

On September 9, 1980, a German emissary reported to the United States that the Iranians sought discussions for settlement of the crisis in West Germany. Khomeini articulated four conditions for the release of the hostages. The United States would have to: (1) pledge that it would not intervene in the internal affairs of Iran; (2) return all of the frozen assets to Iran; (3) cancel all U.S. claims against Iran; and (4) return the wealth of the Shah to Iran. The American response to this proposal was that it would: (1) agree to nonintervention; (2) return approximately $ 5.5 billion, but retain the remainder of the frozen assets until something was done about Iran's debts to U.S. banks and the judicial attachments previously obtained by U.S. claimants; (3) bring about the cancellation of claims provided Iran agreed to allow claimants to submit claims to an international arbitral tribunal and to pay awards by the tribunal; and (4) assist in litigation for the return of the Shah's assets. The claims presented a thorny issue for the negotiators. Legal obstacles precluded the release of the encumbered assets. The amounts involved ran into the billions of dollars, and an unconditional release of the frozen assets would have been regarded as the payment of ransom, an avenue publicly declared as unacceptable. The American negotiating team was also aware that pending claims against Iran were vulnerable to Iran's defense of sovereign immunity.

On January 19, 1979, the United States and Iran entered into an agreement commonly referred to as the Algiers Accords ("Accords.") The following day, the hostages were released. The Accords established a binding arbitration procedure for any claims not settled within six months, and created the Iran–United States Claims Tribunal, in The Hague, to arbitrate claims between the governments of each party and the people of the other. The Claims Tribunal's jurisdiction was meant to preclude litigation by Americans against Iran in American courts. The United States agreed to terminate all legal proceedings against Iran, nullify all attachments on Iranian assets, prohibit all further litigation based on such claims, and to lift the freeze. Executive orders, issued on January 19, 1981, revoked all licenses allowing "any right, power, or privilege" with respect to Iranian funds and annulling all non-Iranian interests in Iranian assets acquired after the blocking order. Exec. Orders Nos. 12276–12285, 3 C.F.R. 104–118 (1981), *reprinted in* 50 U.S.C. § 1701 n. at 192–197 (1994). President Ronald Reagan issued an executive order on February 24, 1981, ratifying Carter's executive orders implementing the Algerian Accords, suspending all claims that "may be presented to the ... Tribunal," and providing that such claims "shall have no legal effect in any action now pending in any court of the United States." Exec. Order No. 12294, 3 C.F.R. 139 (1981), *reprinted in* 50 U.S.C. § 1701 n. at 197–198. The Supreme Court upheld the revocation of the licenses and the suspension of the claims in *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

### C. Plaintiff's IRB Bad Debts

From 1975 to 1979, Reading and Bates and its subsidiaries did business with IRB. In 1979, these transactions resulted in accounts receivables owed by IRB to plaintiff ("IRB receivables") and accounts owed by plaintiff to IRB ("Plaintiff receivables"). The amounts owed by IRB to plaintiff exceeded the amounts owed to IRB by $ 1,078,026.27. The net inter-company receivables represent payments made on behalf of IRB for which plaintiff did not receive reimbursement. The amounts were generated over time under normal operating procedures whereby plaintiff procured materials, supplies, and equipment around the world for IRB. Each IRB receivable was a distinct and separate debt

from each plaintiff receivable. Plaintiff also had $ 114,076.74 in trade accounts receivables owed to plaintiff for IRB's Iranian operations; $ 293,000 in interest receivables outstanding on December 31, 1979, on accounts receivable relating to service agreements; and $ 559,130.96 in interest on stock dividends on IRB preferred stock payable from IRB to plaintiff. Plaintiff designated RBX responsible for all payments due IRB and all debts owed by IRB. On December 31, 1979, there was $ 2,044,234 more due plaintiff from IRB than owed plaintiff by IRB. That sum, $ 2,044,234, is the total amount claimed by plaintiff as a deduction under 26 U.S.C. § 166 (1994).

Plaintiff declared these deductions in amended returns filed on December 23, 1992.[7] The IRS disallowed the claimed deductions on February 24, 1993. This suit followed.

## DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate when there exist no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court does not weigh the evidence; it only determines questions of law based upon undisputed facts. Disputes over facts which are not outcome determinative, however, will not preclude the entry of judgment. *Id.* at 248, 106 S.Ct. at 2510. When the moving party has met its burden of showing entitlement to judgment as a matter of law, the burden shifts to the non-moving party to provide facts establishing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S.Ct. 1348, 1355–1356, 89 L.Ed.2d 538 (1986). The non-moving party may not discharge its burden by cryptic, conclusive, or generalized responses. *See*

*Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3rd Cir.1975).

When the parties have filed cross motions for summary judgment, as in this case, the court must evaluate each party's motion on its own merits. The court's duty to decide whether summary judgment is appropriate is not abrogated by the fact that both parties argue in favor of summary judgment and allege that there are no genuine issues of fact for trial. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir. 1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390–1391 (Fed.Cir.1987)); *see also Bataco Indus., Inc. v. United States*, 29 Fed.Cl. 318, 322 (1993), *aff'd*, 31 F.3d 1176 (Fed.Cir.1994). Summary judgment will not necessarily be granted to one party or another simply because both parties have so moved. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–693 (4th Cir. 1968)). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *Bataco*, 29 Fed.Cl. at 322. The court must evaluate each party's motion independent of the other, and resolve all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors*, 812 F.2d at 1391.

Plaintiff's motion for partial summary judgment seeks a tax refund for amounts paid in protest arising from two wholly distinct factual issues. The first issue involves the proper year of inclusion for income realized from an Egyptian tax indemnification agreement. Plaintiff argues that income from the contractual indemnification of its 1976 and 1977 Egyptian taxes should be recognized in 1984, when tax contests brought in Egypt on plaintiff's behalf concluded. Defendant's motion for partial summary judgment urges the court to find that the indem-

---

7. Plaintiff's returns for 1976 through 1981 were was audited by the IRS. From 1977 to 1992, plaintiff filed a series of returns and amended returns.

nification payments were income to plaintiff in the years (1976 and 1977) to which the Egyptian taxes relate.

The second issue involves the deductibility, under 26 U.S.C. § 166, of bad debts effectively arising from the Iranian Revolution in 1979. Plaintiff contends that it is eligible for a $ 2.04 million deduction for losses sustained in dealings with an Iranian affiliate expropriated by the Islamic government of Iran. Defendant responds that plaintiff is not eligible for a deduction under section 166(a)(1) because: 1) the status quo was favorable to plaintiff at the end of 1979; 2) any amounts owed to plaintiff could be recovered in the future, and 3) the debts were non-deductible because they were not wholly worthless and plaintiff failed to charge them off as partially worthless.

In the present case, the court finds no genuine issues of material fact which preclude summary judgment. The court finds that income from the WEPCO indemnification agreement did not become taxable until the conclusion of the Egyptian tax litigation in 1984. The court also finds that plaintiff is not entitled to a 1979 deduction under section 166(a)(1) for bad debts incurred in its Iranian operations. As a result, the court grants in part and denies in part plaintiff's motion for partial summary judgment; grants in part and denies in part defendant's motion for partial summary judgment; and stays defendant's partial motion to dismiss for settlement.

## II. Western Desert Contract Income Issue

■ The Internal Revenue Code defines gross income in broad terms to reflect Congress' intent to tax all gains not specifically exempted. *See* 26 U.S.C. § 61 (1994); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429–430, 75 S.Ct. 473, 475–476, 99 L.Ed. 483 (1955). Plaintiff concedes, as it must, that income results from a tax indemnification agreement, such as the one in this case, whereby one party contractually assumes responsibility for another's taxes. *See, e.g., Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 729–731, 49 S.Ct. 499, 504, 73 L.Ed. 918 (1929); 26 C.F.R. § 1.61–14 (1996) ("An-

other person's payment of the taxpayer's income taxes constitutes gross income to the taxpayer unless excluded by law.") The question in this case, therefore, is not whether, but when plaintiff realized income from the WEPCO indemnification agreement.

The Internal Revenue Code provides that taxable income "shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." 26 U.S.C. § 446(a) (1994). Plaintiff was an accrual method taxpayer. Under the accrual method, reporting of income is generally governed by the "all events" test first articulated in *United States v. Anderson*, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926).

In *Anderson*, the Supreme Court held that a tax payment for the sale of munitions was a deductible expense only in the year the sale occurred and not the following year, when the tax was paid. The taxpayer in *Anderson* contended the tax could not be accrued as an expense prior to its assessment and due date. The Court, rejecting that argument, found "that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it." *Anderson*, 269 U.S. at 441, 46 S.Ct. at 134. In *Spring City Foundry Co. v. Commissioner*, 292 U.S. 182, 184, 54 S.Ct. 644, 644–645, 78 L.Ed. 1200 (1934), the Court extended this rationale to the accrual of income, "it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income." The all-events test has been adopted by regulation for the accrual of income, 26 C.F.R. § 1.451–1(a) (1996) ("income is includible [sic] in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy"), and expenses, 26 C.F.R. § 1.446–1(c)(1)(ii) ("[u]nder such a method, a liability is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and eco-

nomic performance has occurred with respect to the liability.").

Defendant contends that plaintiff must report income from the WEPCO indemnification agreement in the tax years to which the income relates (1976 and 1977). Plaintiff argues that income from the indemnification did not accrue until 1984 because all of the events fixing the right to receive the income did not occur, and the amount of such income could not be determined with reasonable accuracy, until 1984. Plaintiff articulates several grounds on which, it contends, the all events test precludes the inclusion of income from the agreement until 1984. Each rationale is addressed seriatim.

In order to determine the proper timing for the accrual of income from the indemnification agreement, the court must first consider the proper timing for the accrual of the Egyptian taxes as if they were a deductible expense. The indemnification agreement at issue results in taxable income to plaintiff because it contractually discharges plaintiff's Egyptian tax obligation.[8] *See Old Colony,* 279 U.S. at 729, 49 S.Ct. at 504 ("[t]he discharge by a third person of an obligation to him is equivalent to receipt by the person taxed"). As a result, plaintiff's right to receive the income and the amount thereof are inextricably tied to the fact and amount of its liability for the Egyptian taxes. When plaintiff's liability fixed and the amount could be determined with reasonable accuracy, plaintiff acquired the right to demand indemnification. When plaintiff's right of indemnification fixed, income from that indemnification accrued. *See Spring City,* 292 U.S. at 184, 54 S.Ct. at 645 ("it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income.").

█ Plaintiff appears to suggest that income from the contractual indemnification agreement was contingent because plaintiff had no assurance that WEPCO would honor the contract or have the financial ability to meet its contractual indemnification obligation. The record belies plaintiff's allegation. WEPCO, in conformity with the con-

tract, vigorously prosecuted the tax appeal on plaintiff's behalf. When those efforts failed, WEPCO paid its contractual obligation in a timely manner. Risk accompanies all business transactions. Risk of collection in a credit transaction is not an accrual defeating condition. *See W.S. Badcock Corp. v. Commissioner,* 491 F.2d 1226 (5th Cir. 1974); *Ohmer Register Co. v. Commissioner,* 131 F.2d 682 (6th Cir.1942). Similarly, ordinary risks of non-performance, present in all contractual business relationships, do not defeat accrual because, "[i]f such possibility of non-payment were to be accepted as a sufficient reason for not recognizing an item of income, the whole theory of the accrual method of accounting would fall where commercial transactions are concerned." *W.S. Badcock,* 491 F.2d at 1228 n. 4 (*quoting,* Holland, *Accrual Problems and Tax Accounting,* 48 Mich.L.Rev. 149 (1949)).

Plaintiff also argues that, under the traditional all events test, the WEPCO contract did not result in income to RBDC until 1984 because RBDC was not entitled to income under the contract and the amount of that income could not be determined with reasonable accuracy until 1984. Plaintiff contends that the contract did not entitle plaintiff to income unless it incurred Egyptian tax liability. Plaintiff argues that because RBDC reported no Egyptian tax liability on its 1976 and 1977 returns, WEPCO had no obligation to indemnify, and RBDC had no resulting income in 1976 and 1977.

Plaintiff's argument, to the extent it focuses on plaintiff's belief that it owed no Egyptian taxes at the close of 1976 and 1977, is misplaced. The court does not question the sincerity of that belief. The appropriate question, however, is not whether plaintiff believed that it owed Egyptian taxes for 1976 and 1977, rather, whether all events had occurred which established plaintiff's Egyptian tax liability, fixed the right to receive income from the indemnification agreement, and permitted the amount to be determined with reasonable accuracy. *See Anderson,* 269 U.S. at 441, 46 S.Ct. at 134.

---

8. Under the contract, plaintiff's Egyptian taxes became WEPCO's "charge and responsibility." If, instead, the agreement provided for mere re-

imbursement of plaintiff's Egyptian tax expenses, income may not accrue until plaintiff actually paid the taxes.

Plaintiff's claim that it did not have income until Egypt demanded payment of the taxes is also unfounded. Accrual does not depend on the actual receipt of income or the demand for payment of a liability. In *Anderson*, the Court discussed the timing for accrual of a tax as an expense:

> In a technical legal sense it may be argued that a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it. In this respect, for the purposes of accounting and of ascertaining true income for a given accounting period, the ... tax here in question did not stand on any different footing than other accrued expenses appearing on appellee's books. In the economic and bookkeeping sense with which the statute and Treasury decision were concerned, the taxes had accrued.

*Anderson*, 269 U.S. at 441, 46 S.Ct. at 134. Similarly, income may accrue prior to receipt. *See Spring City*, 292 U.S. at 184, 54 S.Ct. at 644–645. Thus, the proper focus under the all events test is whether the events established plaintiff's liability for the tax (and consequently fixed plaintiff's right to indemnification), not on whether the taxes were due and payable.

Defendant argues that the facts that determined the amount of the Egyptian taxes, plaintiff's liability to pay, and WEPCO's obligation to indemnify, were fixed prior to the close of the 1976 and 1977 tax years. Defendant relies upon *Uncasville Mfg. Co. v. Commissioner*, 55 F.2d 893, 895 (2d Cir. 1932), to support this argument. In *Uncasville*, Judge Learned Hand, applying *Anderson*, articulated the difference between a contingency that defeats the all events test and one that does not. In *Uncasville*, the question surrounded the deductibility of a state tax calculated upon the taxpayer's federal returns. In 1925, the Commissioner of Internal Revenue increased the taxpayer's federal income for 1918 resulting in the imposition of higher state taxes. Uncasville argued that a deduction resulting from the additional state tax should be taken in 1918,

while defendant argued that the amount could only be deducted in 1925, when it was finally fixed by the commissioner. The court ruled that the deduction was proper in 1918 because:

> All the facts upon which the calculation depended had been fixed before the expiration of the year 1918. Differences could arise, and did, as to the amount of the company's income for that year, but they were due to the proper appraisal of its property, and possible disputes as to the meaning of the law. The computation was uncertain, but its basis was unchangeable; it was unknown, but not unknowable on December 31, 1918.

*Uncasville*, 55 F.2d at 895. Defendant argues that all of the facts which determined plaintiff's Egyptian tax liability and the amount thereof, were fixed at the close of 1976 and 1977. The litigation that followed the 1981 audit reflected differences pertaining to the tax consequences of those facts. Specifically at issue were the deductibility of certain expenses, and the proper reporting of income. As in *Uncasville*, defendant argues, the computation was unknown, but the basis was knowable and unchangeable.

The court is spared from deciding whether defendant's *Uncasville* theory applies in this case by the "contest doctrine" articulated by the Supreme Court in *Dixie Pine Products v. Commissioner*, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 (1944), twelve years after *Uncasville*.

In *Dixie Pine*, the state of Mississippi declared that a solvent used in the taxpayer's business was gasoline under state law and taxed it accordingly. Dixie Pine paid the tax and brought suit in state court to reverse the interpretation of the statute and to enjoin the state from collecting taxes in respect of it. The state demurred to the complaint, and the trial court sustained the demurrer. Dixie Pine appealed the ruling to the state supreme court which reversed and remanded the case, ruling that demurrer to the complaint should have been overruled because, upon the pleading, the solvent was not within the definition of gasoline contained in the state statute.

Following this decision, Dixie Pine denied that it owed the tax and refused to pay. Mississippi, however, continued to assess and demand payment of the tax throughout 1937. On December 21, 1938, the trial court entered its final decree permanently enjoining the state from assessing the tax upon the solvent used by Dixie Pine. The Supreme Court of Mississippi affirmed this decision on October 23, 1939.

In December of 1937, Dixie Pine, an accrual basis taxpayer, made entries accruing the gasoline tax assessed by the state in 1937. Dixie Pine then entered this amount as a deduction on its 1937 Federal income tax return. In light of the trial court's final ruling, Dixie Pine included the amount as income on its 1938 return. The IRS disallowed the 1937 deduction and Dixie Pine appealed.

The question for the Supreme Court was whether the 1937 federal deduction was properly disallowed. The Court concluded that the state gasoline tax could not be deducted in 1937 because Dixie Pine's state tax liability was contingent. The Court observed that "the taxpayer was strenuously contesting liability in the courts and, at the same time, deducting the amount of the tax, on the theory that the state's exaction constituted a fixed and certain liability." *Dixie Pine,* 320 U.S. at 519, 64 S.Ct. at 365. The Court ruled that, under the circumstances, the taxpayer must "await the event of the state court litigation and might claim a deduction only for the taxable year in which its liability for the tax was finally adjudicated." *Id.*

Plaintiff also directs the court's attention to *Campana Corp. v. Commissioner,* 210 F.2d 897, 901 (7th Cir.1954). In *Campana,* the taxpayer had a sales contract with its exclusive distributor which fixed the prices at which Campana's products were sold to the distributor and included a provision whereby any excise taxes (state or federal) incurred by Campana were added to the price of the products and paid by the distributor. Federal excise taxes were imposed on Campana from 1933 to 1939. Campana paid the taxes under protest in 1937 and 1938 and sued for a refund. Campana's summary judgment motion was granted by the district court,

then reversed and remanded on appeal. The issue was ultimately resolved, adversely to the taxpayer, by the Supreme Court in *F.W. Fitch Co. v. United States,* 323 U.S. 582, 65 S.Ct. 409, 89 L.Ed. 472 (1945), and, on June 20, 1945, Campana moved to dismiss its case in district court. Campana then entered an agreement with the distributor to satisfy the tax indemnification obligations owed by the distributor under the sales contract.

In its 1937 and 1938 returns, Campana, an accrual basis taxpayer, deducted the amounts of the excise taxes paid under protest. Following resolution of the litigation, Campana claimed that, under the sales contract, the distributor became liable in 1937 and 1938 to pay Campana the protested excise taxes. Consequently, Campana argued, it was entitled to accrue the taxes as income for 1937 and 1938.

Campana's claim was rejected by the I.R.S. and denied by the Tax Court. The Seventh Circuit affirmed, ruling that, under *Dixie Pine,* Campana could not simultaneously contest the legality of the tax with the IRS and claim it was entitled to indemnification from the tax by the distributor. *See Campana,* 210 F.2d at 900 ("[I]f the Sales Company was not liable to pay during those years under the circumstances existing, petitioner was without right to accrue the liability as income.... petitioner's right to receive payment and the liability of the Sales Company were contingent upon the result attained by petitioner in its suit for refund against the Collector.")

Defendant notes that the contest doctrine is a departure from the traditional accrual concept. *See Dravo Corp. v. United States,* 172 Ct.Cl. 200, 348 F.2d 542, 544 (1965). *Dixie Pine,* defendant argues, was designed to prevent a taxpayer from taking inconsistent positions on a tax liability. According to defendant, the contest doctrine does not delay accrual in this case because the contest was nominal. The tax contest was nominal, defendant argues, because WEPCO handled the Egyptian tax litigation and, despite WEPCO's position that plaintiff was not liable for Egyptian taxes, it was in plaintiff's financial interest to lose the tax contest.

While the Court in *Dixie Pine* was clearly concerned with the inconsistent positions taken by the taxpayer, the holding of *Dixie Pine* is not so limited. In *Dixie Pine*, the contest itself made the state tax liability contingent. Here, the fact that plaintiff was not actively contesting its Egyptian tax liability does not change the fact that WEPCO was challenging that liability on plaintiff's behalf. The Egyptian tax contest delayed accrual of plaintiff's income because plaintiff's liability for the Egyptian taxes, and the amount thereof, were subject to the litigation. If WEPCO had succeeded in persuading the Egyptian tax board that plaintiff had no Egyptian tax liability, plaintiff would have no income from the indemnification agreement. *See Campana*, 210 F.2d at 900–901. When WEPCO succeeded in reducing plaintiff's tax liability, the amount of plaintiff's indemnification income was reduced. The Egyptian tax litigation in this case is an accrual defeating condition.

Defendant's argument that the tax contest doctrine is inapplicable to this case because the contest here was nominal is also unpersuasive. Defendant has attempted to probe plaintiff's subjective interest by weighing the beneficial effect of the tax credit against the detrimental effect of additional income.[9] The court, however, is inclined to examine the immediate, proximate, and reasonably anticipated consequences of plaintiff's actions with the view that one who takes such actions anticipates their natural consequences. *See Army Times Sales Co. v. Commissioner*, 35 T.C. 688, 704, 1961 WL 1239 (1961). In its original 1976 and 1977 Egyptian tax filings, plaintiff reported income and deductions that, it believed, absolved it of Egyptian tax liability. This position was consistent with that taken by WEPCO in the tax contest.

The court concludes that plaintiff's right to receive income as well as a reasonably accurate determination of the amount of income attributable to the WEPCO indemnification agreement, depended upon the resolution of WEPCO's Egyptian tax appeals. The cases relied upon by defendant, *United States v.*

*Anderson*, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926), *Uncasville*, 55 F.2d at 895, and *Eastman Kodak Co. v. United States*, 209 Ct.Cl. 365, 534 F.2d 252 (Cl.Ct.1976), do not involve tax contests.

Finally, defendant argues that *Acme Coal Co. v. United States*, 70 Ct.Cl. 696, 44 F.2d 95 (1930), provides an independent basis for applying income from the WEPCO indemnification agreement to plaintiff's 1976 and 1977 returns. Defendant argues that *Acme Coal* permits the IRS to consider subsequent facts in reviewing plaintiff's returns. Thus, when plaintiff filed its amended returns in 1992, the IRS was permitted to examine the 15 year period between the filing of plaintiff's original return and the filing of plaintiff's amended return. In doing so, defendant argues that the IRS could see that plaintiff was claiming a foreign tax credit for 1976 and 1977, thus claiming that the contest doctrine did not bar the accrual of the credit, while claiming that the contest doctrine prevented income from WEPCO's payment of these taxes from accruing until 1984. Defendant argues that the expense item (Egyptian taxes) and the income item (WEPCO indemnification) are interrelated items of expense and income that must be matched to prevent distortion of plaintiff's income in violation of clear reflection of income mandate of 26 U.S.C. § 446(b).

Defendant's argument is unpersuasive. *Acme Coal* does not alter the basic premise of the all events test and the contest doctrine. While the commissioner had the benefit of reviewing subsequent facts, those facts provide no basis for concluding that plaintiff's income from the indemnification agreement accrued prior to the resolution of the Egyptian tax contest.

Defendant's argument is based on the erroneous assumption that foreign tax credits are treated in the same manner as income. The accrual of a foreign tax credit is governed by the all events test. If the foreign tax is uncontested, the tax credit applies to the year in which the foreign tax was levied. If, however, the taxpayer contests the for-

---

**9.** Defendant's theory is based on the idea that plaintiff would have been allowed to take a federal tax credit for the Egyptian taxes paid, directly reducing its federal income, while income from the indemnification would be taxed at plaintiff's federal tax rate of forty-eight percent.

eign tax assessment, the taxpayer must accrue the foreign tax liability as a credit against the United States tax in the year in which the liability has been finally determined. *See Cuba Railroad Co. v. United States*, 124 F.Supp. 182 (S.D.N.Y.1954). Once the liability becomes fixed, after the dispute has been resolved, the accrued foreign tax liability "relates back" to the year in which it was levied. Rev. Rul. 58–55, 1958–1 C.B. 266; *see United States v. Campbell*, 351 F.2d 336, 338 (2d Cir.1965). In contrast, income does not automatically relate back to a prior period.

## II. Bad Debt Deduction Issue

■ Generally, a deduction is allowed for any qualified debt which becomes worthless within the taxable year. 26 U.S.C. § 166(a). Treasury Regulation section 1.166–1(c) provides that only a bona fide debt qualifies for purposes of section 166, and defines a bona fide debt as that which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. 26 C.F.R. § 1.166–1(c). A debt arising from the accounts receivable of an accrual method taxpayer is an enforceable obligation so long as the income such debt represents has been included in income for the year in which the deduction is claimed or for a prior year. 26 C.F.R. § 1.166–1(c). To qualify for a section 166(a)(1) deduction, the taxpayer bears the burden of demonstrating that the debt became wholly, not partially, worthless within the taxable year. *Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. v. United States*, 164 Ct.Cl. 226, 240 (1964). A determination of worthlessness requires consideration of "all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor." 26 C.F.R. § 1.166–2(a). The focus of this examination, however, is on the events known or reasonably knowable at the end of the tax year in question. *See Estate of Mann (Duval v. United States)*, 731 F.2d 267, 278 (5th Cir.1984) ("If and when such a debt becomes wholly worthless must be determined from the facts and circumstances known or which reasonably could have been known at the end of the year of asserted worthlessness.").

Plaintiff argues that the $ 2.04 million it declared under section 166 represented bona fide debts which arose from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Plaintiff argues that the political situation in Iran made these debts wholly worthless in 1979.

Defendant contends that the $ 2.04 million plaintiff declared as a section 166(a)(1) bad debt deduction was improper because it was not wholly worthless at the end of 1979. First, defendant argues that the $ 2.04 million represents an aggregation of partially worthless debts, carried as assets on plaintiff's balance sheet for 1979, that are ineligible for a deduction under section 166(a)(1).[10] Next, defendant argues that the deduction was improper because, at the end of 1979, plaintiff had a reasonable likelihood of recovering the amounts at issue. Finally, defendant argues that plaintiff did not incur a debt within the meaning of section 166(a)(1) because, on December 31, 1979, the status quo favored plaintiff in its relations with IRB.

As a preliminary matter, the court notes that plaintiff is claiming a bad debt deduction under section 166 for receivables owed by IRB, not a section 165 deduction for losses incurred in the Iranian revolution. Defendant does not contest that the $ 2,044,233.97 declared as a section 166 deduction was an enforceable obligation, and that the receivables were included as income in the taxable year ending December 31, 1979, or prior taxable years. Both parties concede that IRB was expropriated by the revolutionary government of Iran in 1979. It appears, however, that IRB retained some value throughout the period in question. *See Reading & Bates Exploration Co., Irano-Reading & Bates, SSK and National Iranian Old Company*, 26 Iran–U.S. Cl.Trib.Rep. 265 (1991) (plaintiff transferred equity interest in IRB and other properties in Iran to National Iranian Oil Company in exchange

---

10. Partially worthless debts are deductible under section 166 only to the extent they are charged off during the tax year. *See* 26 C.F.R. § 1.166–3(a)(2)(i).

for $ 4 million payment and settlement of all claims between the parties). Whatever form IRB retained at the end of 1979, it was no longer controlled by plaintiff and was either unwilling or unable to pay its debts to plaintiff.

## A. Partially or wholly worthless debts

Defendant argues that the $ 2.04 million declared by plaintiff to be a wholly worthless debt was an aggregation of partially worthless debts that plaintiff carried as assets on its balance sheet for 1979. Plaintiff concedes that the amount declared as a section 166 deduction is a net amount, calculated by subtracting $ 9,981,374.93 in accounts owed by plaintiff to IRB from $ 12,025,608.90 in accounts owed by IRB to plaintiff. Plaintiff also concedes that these debts were placed in a suspended assets account. Defendant contends that the $ 9,981,374.93 owed to IRB must be applied pro rata as partial (83 percent) payment against each of the debts from which the $ 12,025,608.90 is derived. According to defendant, plaintiff's failure to charge-off these partially worthless debts prevents it from taking a deduction under section 166.

Defendant's partially worthless debt argument exhibits a fundamental misunderstanding of section 166. The regulations clearly contemplate the deduction of open accounts. *See* 26 C.F.R. § 1.166–1(c). Here, plaintiff calculated its outstanding receivables by subtracting amounts owed by plaintiff to IRB from amounts owed to plaintiff from IRB. Plaintiff did not thereby render the debts partially worthless. *See R.H. Barbour v. Commissioner,* 29 T.C. 1039, 1044, 1958 WL 1141 (1958) (To prove eligibility for a bad debt deduction, it is incumbent on taxpayer to establish "a net indebtedness in his favor and its amount"). A debt is wholly worthless, under section 166(a)(1), when there is no reasonable likelihood of prospective recovery; and partially worthless, under section 166(a)(2), where it appears that only a portion of the debt will be recoverable in the future. *See* 26 U.S.C. § 166; *Spring City Foundry,* 292 U.S. at 187–189, 54 S.Ct. at 646–647 (explaining differences between partially and wholly worthless debts under precursors to 26 U.S.C. § 166); *Estate of Mann,*

731 F.2d at 276 ("Debts are wholly worthless when there are reasonable grounds for abandoning any hope of repayment in the future, and it could thus be concluded that they have lost their 'last vestige of value.' ") (citations omitted). A taxpayer is not prevented from deducting the outstanding balance of a debt as wholly worthless, by the fact that payments were once received on the original obligation. Plaintiff alleges that the entire $ 2,044,233.97 was wholly worthless in 1979, because there was no reasonable likelihood of recovering that amount in the future. There is no charge-off requirement for wholly worthless debts under section 166(a)(1).

## B. Worthlessness of Plaintiff's IRB Debts

Defendant argues that the $ 2.04 million declared by plaintiff to be a wholly worthless debt could not be deducted in 1979, because there was no basis at that time for doubting that plaintiff would recover the amount at issue if the executive order was lifted. Defendant does not claim that a forum existed in 1979 for plaintiff to bring suit on the debts or to attach assets that were subject to the freeze. Iranian courts were clearly not amenable to suit by American entities in 1979, and plaintiff would have had difficulty filing a claim in the United States because federal courts generally lacked jurisdiction over Iran. *See* 28 U.S.C. § 1604 (1976) ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States . . . ."); *see, e.g., McKeel v. Islamic Republic of Iran,* 722 F.2d 582 (9th Cir.1983) (discussing federal court's lack of jurisdiction to hear claims against Iran). Defendant argues that there was no basis for concluding that the IRB bad debts were worthless on December 31, 1979, rather, they were, at most, temporarily uncollectible.

Defendant notes that the articulated purpose for the executive order was to ensure that resources would be available to satisfy American claims against Iran, and that there was no reasonable basis to believe that the executive order would be lifted without substantial consideration for the rights of American creditors. Alternatively, defendant argues that even without such consideration,

there was a reasonable likelihood of recovering the bad debts once the freeze was lifted. Defendant contends that IMDBI and IRB had a substantial interest in bringing suit against plaintiff for payment for the rigs. Once suit was initiated, plaintiff could counterclaim against IRB for payment of the $ 2.04 million. Finally, defendant claims that plaintiff could bring suit against IRB directly on the $ 2.04 million debt. In either case, defendant argues that a post-freeze legal recovery was reasonably likely, thereby giving the debts value.

Plaintiff contends that the IRB debt was wholly worthless at the end of 1979, because of the political situation in Iran and plaintiff's complete inability to recover any amount from IRB, but plaintiff fails to articulate any steps taken to collect the debt. Instead, plaintiff relies on two tax court cases, *Halliburton v. Commissioner*, 93 T.C. 758, 1989 WL 154241 (1989), and *Continental Illinois v. Commissioner*, 94 T.C. 165, 1990 WL 17257 (1990), to prove that its IRB debts were wholly worthless.

*Halliburton v. Commissioner*, 93 T.C. 758, 1989 WL 154241 (1989), aff'd, 946 F.2d 395 (5th Cir.), involved an American oil field services company that purchased stock and loaned money to an Iranian joint stock corporation. The Iranian company was expropriated by Iran in 1979, and Halliburton sought to deduct losses, pursuant to section 165, for the expropriation of its stock interest and debt.[11] Both deductions were disallowed by the IRS. The government argued that the executive order freezing Iranian assets ensured Halliburton's eventual recovery under international law. The essence of the government's theory was that Halliburton could reasonably expect recovery because the executive order would not be lifted without consideration of the claims of American creditors. *Halliburton*, 93 T.C. at 777–778. The court rejected this theory, concluding that even if a claim for reimbursement existed in 1979,[12] Halliburton had no reasonable prospect for recovery on that claim:

[C]ontrary to respondent's assertion, a recovery light did not exist at the end of the tunnel of the uncertainties present at the end of 1979, which could reasonably have been perceived by petitioner at that time. To conclude otherwise, would, in our opinion, impose upon petitioner the necessity of having had to make delicate political, economic, and diplomatic judgments in the complex arena of international, as well as domestic, relationships. This is a task which we do not think any taxpayer should be required to undertake, even one as sophisticated and knowledgeable as petitioner appears to have been. In this connection, we note that the factors in the instant case are entirely different from those involved in making a judgment as to worthlessness where only business facts are involved and the taxpayer has the full capacity to ascertain the pertinent facts and make his own evaluation of their impact.

*Halliburton*, 93 T.C. at 781.

In *Continental Illinois v. Commissioner*, 94 T.C. 165, 1990 WL 17257 (1990), petitioner owned stock in two Iranian banks, Bank Dariush and the Industrial and Mining Development Bank of Iran. On its federal return for 1979, Continental deducted $ 7.1 million for its expropriated stock interest in the banks under section 165. The court ruled that issues involving the existence of Continental's expropriation claims (other than through set-off) and whether there was a reasonable prospect of recovery on those claims in light of the freeze order, were governed by its prior ruling in *Halliburton*. *Continental*, 94 T.C. at 181. Although Continental held $ 70 million in Iranian assets, the court found that the collateral did not strengthen its prospects

---

**11.** The opinion does not indicate how this "debt" could be deducted as a "loss" under section 165.· Halliburton presented an alternative argument, that the losses were worthless securities and bad debts under sections 165(g) and 166(a) respectively. The tax court found it unnecessary to reach this argument. Ordinarily, when a deduction qualifies for treatment under sections 165 and 166, it must be declared under section 166.

See 15 J. Mertens, *Law of Federal Income Taxation* § 30.41 (1994) [hereinafter *Mertens*].

**12.** Under section 165, the provision at issue in *Halliburton*, the taxpayer cannot take a deduction where "there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery." 26 C.F.R. § 1.165–1(d)(2)(i).

for recovery. The court ruled that Continental was entitled to a deduction because it had no right of set-off with respect to its claims as long as the freeze order remained in effect, and would likely encounter considerable difficulty in asserting any set-off in the wake of the freeze. *Continental,* 94 T.C. at 188. The court reasoned that unless the freeze was lifted in conjunction with an arrangement for the settlement of claims, any legal action against Iran to assert the set-off would be thwarted by Iran's defense of sovereign immunity and the act of state doctrine. The court found that. at the end of 1979, the prospects for a settlement arrangement did not create a reasonable prospect for recovery. The court also rejected the idea that Continental could retain the Iranian assets and await an Iranian lawsuit to recover the retained funds, enabling it to assert a set-off pursuant to *Nat. City Bank of New York v. Republic of China,* 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955). The court concluded this route was too tenuous to amount to a reasonable likelihood of recovery because "the scope of the setoff exception to the general rule in respect of the availability of the 'act of state' defense is far from clear[,]" and the extent to which the Iranian government and the Iranian central bank could be viewed as one entity, permitting a set-off, though probable, "would not have been an inevitable result." *Continental,* 94 T.C. at 185. Finally, the court noted that any diplomatic settlement could have diluted Continental's set-off by requiring that retained Iranian assets be pooled to satisfy the claims of others. *Continental,* 94 T.C. at 186. The court concluded:

> [W]e see the appropriate standard in respect of the right of setoff as whether there existed a reasonable possibility of success in the event of litigation. In sum, we think that the threat of setoff was no more than an uncertain bargaining chip and should be accorded no greater weight than we accorded the freeze order.... we also dismiss respondent's assertion that petitioner's mere possession of significant Iranian deposits created a reasonable prospect of recovery.

*Continental,* 94 T.C. at 188.

■ A determination of worthlessness demands a case by case analysis as there is no universal definition of worthlessness. Generally, worthlessness means "destitute of worth, of no value or use." *Black's Law Dictionary* 1607 (6th ed.1990) (citing *Spring City Foundry Co. v. Commissioner,* 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200 (1934)). It implies a lack of current as well as potential value. *See Miami Beach Bay Shore Co. v. Commissioner,* 136 F.2d 408 (5th Cir.1943); *Moore v. United States,* 943 F.Supp. 603, 620 (E.D.Va.1996). By necessity, the inquiry requires a practical, rather than a legal approach. *See Boehm v. Commissioner,* 326 U.S. 287, 292, 66 S.Ct. 120, 123–124, 90 L.Ed. 78 (1945). "A debt is not worthless simply because it is of doubtful value or difficult to collect." *Mertens* § 30.66. The Court of Claims explained the analysis as follows:

> [The test] must be flexible in nature, varying according to the circumstances of each particular case, so that whatever inferences a court might draw from a particular fact in another case are not binding on the examining court, although the same fact may be present.... In making such a determination the taxpayer must follow a rule of reason, avoiding alike the Scyllian role of the "incorrigible optimist" and the Charybdian character of the "stygian pessimist." To be deductible, a debt need not be proven worthless beyond all peradventure, since a bare hope that something might be recovered in the future constitutes no sound reason for postponing the time for taking a deduction. The taxpayer is not required to postpone his entitlement to a deduction in the expectancy of uncertain future events nor is he called to wait until some turn of the wheel of fortune may bring the debtor into affluence. It appears that the taxpayer must strike a middle course between optimism and pessimism and determine debts to be worthless in the exercise of sound business judgment based upon as complete information as is reasonably obtainable.

*Minneapolis, St. Paul & Sault Ste. Marie Railroad,* 164 Ct.Cl. at 240–241 (citations omitted).

■ Applying this flexible standard, the court concludes that, under the circum-

stances of this case, plaintiff's IRB Bad Debts were not wholly worthless at the close of 1979. The executive order freezing roughly $ 12 billion in Iranian assets, diplomatic efforts to secure the release of the hostages and settlement of American claims against Iran, and RBX's existing obligations to IRB created a sound basis for concluding that the debts would be recovered in whole or in part upon the lifting of the freeze. A taxpayer, exercising sound business judgment based upon information reasonably obtainable, would not have to be an incorrigible optimist to determine that Iranian claims had value based on the prospect of future recovery, and would be a stygian pessimist to conclude that there was no reasonable hope of recovery.

Moreover, the court is not persuaded that the worthlessness of plaintiff's IRB debts is established by case law. *Halliburton* and *Continental* involve claims for loss deductions under section 165. As such, the tax court's determination was driven by regulations that pertain to section 165 deductions and by the standard articulated in *Colish v. Commissioner*, 48 T.C. 711, 1967 WL 981 (1967). The regulations provide that a section 165 deduction may not be taken where "there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery ..." 26 C.F.R. § 1.165–1. From this, *Colish* adopted a two part test for assessing deductibility. The first element involves the existence of a claim for the declared loss while the second element is the likelihood of recovery on that claim. *See Colish*, 48 T.C. at 717. In *Colish*, the court reasoned that "unless there exists a claim based on a legal right for reimbursement from a third party in the year a loss occurs, the loss must be deducted in that year." *Id.* In *Halliburton*, the court analyzed the availability of legal action and concluded that, at the end of 1979, sovereign immunity and the act of state doctrine blocked all legal avenues to recovery against Iran. *Halliburton*, 93 T.C. at 771. The tax court declined to reconsider the *Colish* analysis in the context of the Iranian crisis. *Halliburton*, 93 T.C. at 770–771. Ultimately, the court concluded that the taxpayers were entitled to section 165 deductions in 1979 because, even if a claim for reimbursement was assumed to exist in

1979, the taxpayers had no reasonable prospect of recovery in 1979. *Halliburton*, 93 T.C. at 774; *Continental*, 94 T.C. at 188–189. The absence of an existing legal claim in 1979, however, was a ubiquitous concern in the tax court's analysis. *See Halliburton*, 93 T.C. at 774 (concluding that "the absence of an existing legal remedy is an element to be taken into account" in determining whether petitioner had a reasonable prospect of recovery as of December 31, 1979).

An inquiry into the worthlessness of debt, under section 166, does not mirror the analysis of the likelihood of recovery for a loss declared under section 165. While a section 165 loss may be deductible for want of an existing claim based on a legal right to recover, a section 166 deduction requires the taxpayer to prove the existence of a bona fide debt that becomes worthless within the taxable year. Worthlessness under section 166, is not dependant upon the two-step reasoning of *Colish*. It is neither inconceivable nor unreasonable to conclude that a debt for which there is no existing legal claim, nevertheless, has potential value, and therefore worth, especially in light of the executive order that was promulgated, in part, to protect the viability of such claims.

As previously noted, it appears that IRB had some value after the expropriation. Plaintiff claims that IRB was financially strained prior to the Iranian Revolution. Surely, the revolution and the resulting crisis further undermined IRB's financial position. Nothing in the record, however, indicates whether IRB was incapable of paying its debts in whole or in part.

Assuming that IRB was capable, though unwilling, to pay some portion of the obligation, plaintiff's recovery, nevertheless, hinged on the lifting of the freeze. The freeze precluded recovery from IRB's assets (if any) in this country, because IRB would be viewed as an entity of the Iranian government. Moreover, in light of the crisis, it was unreasonable to expect recovery in Iranian courts. Similarly, any direct claim against the government of Iran would have to await the lifting of the freeze order and waiver by Iran of its sovereign immunity.

The executive order freezing Iranian assets was issued on November 17, 1979, in response to reports that Iran intended to withdraw its deposits from the United States, leaving American claimants without recourse. The White House publicly announced that the purpose of the order was to ensure that claims on Iran by the United States and its citizens were provided for in an orderly manner.

On December 31, 1979, plaintiff could reasonably expect that the freeze would eventually be lifted, and that Iranian assets subject to the freeze would inevitably be used as part of either a bilateral settlement of the crisis or a unilateral effort to compensate American claimants. The executive order, therefore, gave value to plaintiff's IRB debts. So long as the order was in place, plaintiff's IRB debts obviously had some value based upon the prospect of recovering the debts in the wake of the freeze.

From November 1979, to January 1981, the United States negotiated with Iran for the release of the hostages and the settlement of American claims against Iran. Ultimately, the terms of the Algiers Accords were developed from positions established during the first three months of the crisis. These positions were set forth in November and December of 1979, and elaborated upon in January of 1980. The frozen assets made American claims against Iran a substantial issue in these negotiations. Iran was in the midst of a financial crisis and clearly needed the United States to lift the freeze order. In turn, the United States wanted to secure the release of the hostages and ensure that American claimants would not be without recourse on their substantial investments in Iran. As noted in the parties' joint stipulation, it was clear that the freeze could only be lifted once the hostages were released in the context of arrangements that would prevent economic disruption and protect American interests.

In *Halliburton,* the tax court found that the articulated rationale for the freeze was subservient to the primary goal of protecting the lives of the American hostages and securing their quick release. *Halliburton,* 93 T.C. at 778 ("We have no doubt as to the President's intention to protect United States claimants, but we are satisfied that it did not rise to the level of a binding commitment."). The court did not accept the government's argument that the freeze order and settlement negotiations created a reasonable prospect of recovering Halliburton's losses. The court concluded that there was a possibility that the freeze could have been lifted in exchange for the release of the hostages, without provisions for the settlement of American claims on Iran. Without an existing legal right to recover, or a binding obligation on the part of the president to provide for recovery, the tax court found no reasonable prospect of recovering section 165 losses. *See Halliburton,* 93 T.C. at 778–781.

This court agrees that the well being of the American hostages was of vital national interest. The court also agrees that there was a possibility that the freeze would be lifted without consideration for American claimants. The bare possibility, however, that the hostages would be freed in exchange for the unconditional release of the frozen assets, was too remote to render plaintiff's uncollected debt worthless in 1979. Recovery need not be inevitable for a debt to have value.

On December 31, 1979, negotiations for the resolution of the crisis were in their infancy. The United States' position, that would eventually shape the settlement, was already firmly established and widely known. As a result, plaintiff could reasonably expect that its claims against Iran would be part of the eventual settlement. The negotiations, therefore, gave plaintiff's IRB debt worth. *See Kirby v. Commissioner,* 35 B.T.A. 578 (1937), *aff'd in part and rev'd in part on other grounds,* 102 F.2d 115 (5th Cir.1939) (bad debts resulting from Mexican insurrection were not worthless until plaintiff's negotiations with the Mexican government to recoup the loss were abandoned). Plaintiff was clearly within the articulated rationale of the executive order and had no reasonable basis for questioning the President's resolve. The purpose of the order, combined with the practical effect of $ 12 billion in frozen Iranian assets, and negotiations for the release of the hostages and the settlement of American

claims, created a reasonable prospect for recovering the debts.

If and when the freeze was unconditionally lifted, plaintiff's debts may have become worthless. Until then, the freeze operated much like a moratorium on claims. Plaintiff was unable to collect the debts, but they were not worthless. *See Mertens* § 30.89 (a moratorium or embargo preventing collection of debts does not make debts per se worthless).

 The court's consideration of the worthlessness of plaintiff's IRB debts is limited to facts and circumstances known or reasonably knowable at the end of 1979. *See Estate of Mann,* 731 F.2d at 278. While subsequent events are not determinative of worthlessness, they can be relevant to the reasonableness of a conclusion that the debt was worthless in a particular year. *Id.* at 278, n. 19. Here, the validity of plaintiff's conclusion that its IRB debts were worthless in 1979 is undermined by subsequent events. On January 19, 1981, the United States and Iran reached agreement on the settlement of the crisis. In the Algiers Accords, Iran released the American hostages, agreed to pay its outstanding bank loans, and agreed to the creation of a binding international arbitration procedure, with claims paid from the formerly frozen assets. Plaintiffs IRB debts were recovered in 1983 and all outstanding claims appear to have been resolved in 1991. *See Reading & Bates Exploration Co., Irano–Reading & Bates, SSK and National Iranian Old Company,* 26 Iran–U.S. Cl. Trib. Rep. 265 (1991). While subsequent collection of an allegedly worthless debt is not a conclusive indication of the debt's value, it may cast doubt on the claim of worthlessness. *See Sommers Oil Co. v. Commissioner,* 23 B.T.A. 285, 293 (1931). Here, plaintiff's claim of worthlessness is undermined, because the basic structure of the Algiers Accords was foreseeable in 1979.

This case is readily distinguishable from cases such as *United States v. S.S. White Dental Mfg. Co. of Pennsylvania,* 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927), and *Colish,* 48 T.C. 711, 1967 WL 981, in which the mere possibility of future recovery was deemed too remote to justify delaying deductions for claimed losses. As already noted, this case arises under section 166 and, therefore, does not depend on the existence of a claim based on a legal right to recover. Furthermore, plaintiff was not dependant upon the good graces of Iran for compensation. Twelve billion dollars in Iranian assets, an amount exceeding all estimates of outstanding claims, were frozen in the United States for the express purpose of satisfying claims similar to plaintiff's. As a result, there was more than a bare possibility of recovery, and plaintiff's debts were not worthless in 1979.

Plaintiff's rights and obligations on the three oil rigs purchased from IRB and sold to RBI Drilling, Ltd., created an additional method of recovering plaintiff's IRB debt. RBX's ability receive payments from RBI, combined with IRB's right to those proceeds on default of RBX's obligation to IRB, gave value to plaintiff's IRB debt. By defaulting on its obligation to IRB, RBX could force IRB to bring suit to recover the obligation. Plaintiff could then exert a set-off to recover the $2.04 million IRB debt.

On November 17, 1977, and April 7, 1978, IRB sold RBX two land rigs and one off-shore drilling rig for $ 6,611,943.51 and $ 8,776,203.72 respectively. RBX subsequently sold these rigs to RBI, a partnership owned fifty percent by Reading & Bates Drilling, and fifty percent by Sanati Corporation. RBI agreed to the same purchase price and similar terms as RBX originally accepted in its agreement with IRB. The sales to RBI were accompanied by purchase agreements and promissory notes in the amount of the purchase price with interest. While the RBX purchase and the RBI purchase are similar, each transaction is legally distinct and the rights and obligations flowing from these transactions must be individually assessed.

On December 31, 1979, the executive order prevented RBX from making payments to IRB. RBX, however, was still bound by the purchase agreements between RBX and IRB, to pay IRB roughly $15 million plus

interest.[13] RBX's debt was nonrecourse, thus, if RBX failed to pay, IRB's recovery was limited to RBX's right, title and interest in and to the rigs, and to any proceeds or notes received from the sale of the rigs. RBI was liable to RBX, under the promissory notes, for the balance of the purchase price plus interest (roughly $ 15 million) on the rigs. RBX could legally demand and reasonably expect RBI's payment on this contractual obligation.[14] These funds could then be withheld, forcing IRB to sue RBX for payment, enabling RBX to exert a set-off for the $ 2.04 million IRB debt.

Plaintiff argues that it could not exert a set-off from the oil rig payments without breaching its fiduciary duty to RBI. The court is unmoved by this argument. As previously noted, IRB was ultimately liable for the $ 30 million debt to IMDBI. If IMDBI successfully foreclosed on RBI's oil rigs, it would be the result of IRB's failure to meet this obligation. Under the circumstances of this case, the court is not persuaded that a fiduciary obligation would have been breached by plaintiff's pursuit of a set-off.

Assuming, as plaintiff alleges, that RBX was merely a conduit for payments from RBI to IRB, RBX, nevertheless, had the ability to impede the flow of payments and thereby force IRB to sue for their recovery. On December 31, 1979, there was no reason for plaintiff to believe that it could not force payment of the IRB debts in this manner.

## C. Status Quo Theory

In light of the determination that plaintiff's IRB debts were not wholly worthless in 1979, the court finds it unnecessary to reach the merits of defendant's claim that the status quo was favorable to plaintiff in 1979, resulting in no real economic loss to plaintiff on its IRB transactions.

## CONCLUSION

For the above-stated reasons, this court concludes that plaintiff is entitled to summary judgment on the Western Desert Contract Income Issue. First, there are no genuine issues of material fact on this issue. Plaintiff has established, as a matter of law, that income from the tax indemnification agreement did not accrue until the Egyptian tax contest concluded in 1984. Defendant has failed to establish that the all events test was met prior to the resolution of the tax contest. Therefore, defendant's motion for partial summary judgment with respect to this issue is denied.

The court concludes that defendant is entitled to summary judgment with respect to the IRB Bad Debt issue. While there are numerous unexplained details in the record, there are no genuine issues of material fact in dispute. Plaintiff's IRB debts were clearly not worthless in 1979. Plaintiff could reasonably expect to recover the debts in whole or in part. As a result, plaintiff's motion for partial summary judgment is denied. Defendant has established that it is entitled to judgment as a matter of law.

Finally, defendant's motion to dismiss counts three and six of plaintiff's amended complaint for lack of jurisdiction is stayed. Issues in count three appear to be subject to settlement negotiations between the parties, and issues in count six may be impacted by this order. The court orders the parties to

---

**13.** The agreements indicate that RBX will assume roughly $ 15 million of IRB's outstanding debt to IMDBI. The agreements clearly indicate that this "assumption" was between IRB and RBX only, it was not a novation on IRB's $ 30 million IMDBI debt. The court has reviewed the various agreements signed by RBODC, RBI, IMDBI, and Sanati, and concludes that they reinforce the fact that IRB was solely responsible for the $ 30 million IMDBI loan, and that payments made by RBX to IMDBI were for the convenience of IRB. In 1978, RBX made interest payments totaling $ 1,383,602.56 to IMDBI on IRB's behalf. In 1979, these payments totaled

$ 1,950,367.51. Thus, by December 31, 1979, the outstanding balance included all of the principal and some portion of the interest.

**14.** Plaintiff suggests that payments from RBI to RBX stopped as a result of the executive order. RBI Drilling, a Netherlands Antilles partnership effectively controlled by plaintiff, was not barred by the executive order, from paying RBX, a domestic subsidiary of plaintiff. RBX clearly had a right to demand payment on the promissory notes.

confer and to report back to the court as to how they wish to proceed by April 20, 1998.

**IT IS SO ORDERED.**