**DART ADVANTAGE WAREHOUSING, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 01–166C.

United States Court of Federal Claims.

June 4, 2002.

---

Robert J. Linhares, Rebman, Linhares & Beachem, St. Louis, Missouri, counsel of record for the plaintiff, Joseph E. Rebman, Rebman, Linhares & Beachem, St. Louis, Missouri, of counsel.

Jason D. Marsh, United States Postal Service, Washington, D.C., counsel of record for the defendant.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

In 1996, the United States Postal Service (USPS) issued a solicitation for full service commercial warehousing located within a thirty (30) mile radius of its Bulk Mail Center in St. Louis, Missouri. The warehousing services to be provided included receiving, handling, storing, product packaging, inventorying and shipping of USPS equipment.

In attachment 1 to the "Specifications/Statement of Work," among other requirements, the USPS advised all bidders that:

The Postal Service's preference is for one (1) warehouse with storage space of a minimum guarantee of 100,000 square feet. Multiple buildings in combination may be used if physically located within the same general business/commercial area and not to exceed a thirty (30) mile radius of the Bulk Mail Center. Only those buildings offered at the time of this proposal will be considered for a contract. Any suggested alternate site must be pre-approved in writing to the Contracting Officer. To meet the additional monthly space requirement, if necessary, a secondary warehouse location must be proposed at the time of the proposed submittal.

The solicitation and contract also indicated: "The period of performance of this contract is for 24 months after the effective date of the contract and an additional period of up to 96 months, subject to exercise of option items."

In response to the solicitation, Dart Advantage Warehousing, Inc. (Dart) designated the Trade Center III warehouse at 3750 Rider Trail South, Earth City, Missouri as the facility that Dart would use to store the USPS equipment if awarded the contract. According to the Commercial Warehouse Profile submitted by Dart, Trade Center III had 200,000 square feet of available internal space, with the possibility of a ten-year renewal.

On September 6, 1996, the USPS awarded Dart Postal Service Contract No. 266351–96–B–1696 (contract). The original term of the contract was a two-year term, from October 1, 1996 through September 30, 1998, with four two-year term renewal options. Item Nos. 01A to 01D of the Contract Schedule phased in the square footage of guaranteed storage space over 180 days from the date the contract was signed. Item No. 01D states: "Guaranteed storage space day 180 to end of contract, 2 year term (see Note 1)." Accompanying Note 1 to Item No. 01D states: "Effective on the 180th day of the contract, guaranteed square footage will be 100,000 for the remainder of the contract term." On June 21, 1996, in Amendment A01 to the Schedule, the first sentence of Section H(6) was amended to state: "The Postal Service may require the delivery of the numbered line item identified in the Schedule as an option item, in the quantity and at the price set forth in the Schedule." The contract also provided time periods for preparation of and entry into a lease of the property to the USPS.

On September 19, 1996, Dart entered into a lease with the owner (owner) of Trade Center III. Under the terms of that lease, Dart leased from the owner 217,400 square feet of storage space at Trade Center III. The USPS was aware that Dart provided storage space and warehousing services at Trade Center III to two other tenants, during much of the time that it provided storage space and warehousing services to the USPS.

On February 6, 1998, the USPS issued Modification No. M01 which states: "This Modification is issued to exercise line Item 02 as additional space will be required. This additional space will be provided as per contract terms. Location: 3750 Rider Trail South, Earth City MO (9 Months 01–31–98 through 09–30–98)." Item No. 02 provided: "Additional monthly storage estimated 0–100,000 sq ft."

On September 25, 1998, the first two-year renewal option was exercised in Modification No. M05 for the period October 1, 1998 through September 30, 2000. Modification No. M05 states that: "All changes are effective 10–01–98." Modification No. M05 also included a "Termination on Notice" clause, which states:

This contract may be terminated in whole or in part by either the Postal Service contracting officer or the contractor upon 180 days written notice. In the event of such termination, neither party will be liable for any costs, except for payment in accordance with the payment provisions of the contract for the actual services rendered prior to the effective date of the termination.

From October 1, 1998 through August 31, 1999, Dart invoiced and the USPS paid for

the guaranteed space and varying quantities of additional monthly space. From September 1, 1999 through September 30, 1999, Dart only invoiced and the USPS paid for the guaranteed space of 100,000 square feet.

In May 1999, Dart entered into a "Second Amendment To Lease" with the owner of Trade Center III which, effective May 31, 1999, reduced Dart's square footage at Trade Center III from 217,400 to 166,200, a 51,200 square foot reduction. Effective June 1, 1999, Best Buy Co., Inc. (Best Buy) entered into a separate lease agreement with the owner of Trade Center III for the lease of the 51,200 square feet of storage space released by Dart. Prior to leasing the 51,200 square feet of storage space from the owner, Best Buy reimbursed Dart for half of the lease costs for the 51,200 square feet of storage space in order to allow Best Buy to construct a wall that would separate the 51,-200 square feet of storage space to be occupied by Best Buy from the rest of the storage space leased by Dart at Trade Center III.

The dispute at issue in this case arose in June, 1999, regarding the total square feet of additional monthly storage space at Trade Center III that Dart was required to provide to the USPS above the 100,000 square feet of storage space guaranteed in the base contract following the issuance of Modification No. M01 and following September 30, 1998. On July 1, 1999, Dart offered the USPS an additional 50,000 to 70,000 square feet of storage space at a different facility located at 13890 Corporate Woods Trail, Bridgeton, Missouri (Bridgeton), and beginning on July 6, 1999, Dart directed all USPS loads to Bridgeton.

On August 26, 1999, the USPS issued Modification No. M008, which terminated the contract "for default as contractor has failed to provide storage space per contract terms." In Modification No. M008, the USPS also stated that: "All equipment will be out of the St Louis warehouse by COB 09/30/99 or sooner." The complaint filed in this court by the plaintiff asserted that the USPS breached the contract by failing to give Dart 180 days advance written notice of termination pursuant to the Termination on Notice clause

added in Modification No. M05. Dart seeks actual damages based on breach of contract for loss of rental payments during the 180 days Termination on Notice period, totaling $138,500.00, plus interest from the date of the certified claim submitted by Dart.

## DISCUSSION

The parties have filed cross-motions for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed.Cir.), *reh'g denied and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001); *Becho, Inc. v. United States*, 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States*, 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.*, 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (C.C.P.A.1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues, must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.*, 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States*, 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings

already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l., Inc.*, 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States*, 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied*, — U.S. ——, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002). After reviewing the parties' submissions, the court finds that there are no material facts in dispute.

**Contract Interpretation**

 The interpretation of a government contract is a matter of law. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.1996); *P.J. Maffei Bldg. Wrecking v. United States*, 732 F.2d 913, 916 (Fed.Cir. 1984); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 386–87, 351 F.2d 972, 973 (1965). As a matter of law, contract interpretation issues are amenable to decision on summary judgment. *See Olympus Corp. v. United States*, 98 F.3d 1314, 1316 (Fed.Cir. 1996); *Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 813 n. 1 (Fed.Cir.1988); *Metric Constructors, Inc. v. United States*, 44 Fed.Cl. 513, 520 (1999), *aff'd*, 10 Fed. Appx. 853 (Fed.Cir.2001). General rules of contract interpretation apply to contracts to which the government is a party. *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed.Cir.1997). The primary objective in contract interpretation is to discern the parties' intent at the time the contract was executed. *King v. Dep't of the Navy*, 130 F.3d 1031, 1033 (Fed.Cir.1997); *Winstar v. United States*, 64 F.3d 1531, 1540 (Fed.Cir.1995) (citing *Arizona v. United States*, 216 Ct.Cl. 221, 234, 575 F.2d 855, 863 (1978)), *aff'd on other grounds*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The language of the "contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. at 388, 351 F.2d at 975. Moreover, words are to be given their plain and ordinary meaning. *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979). In addition, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *See Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d at 322 (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991)); *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1996); *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir. 1985) (citing *United States v. Johnson Con-*

*trols, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir. 1983)). To ascertain the intentions of the parties, the contract should be construed in its entirety, "so as to harmonize and give meaning to all its provisions." *Thanet Corp. v. United States*, 219 Ct.Cl. at 82, 591 F.2d at 633 (citing *ITT Arctic Servs., Inc. v. United States*, 207 Ct.Cl. 743, 751–52, 524 F.2d 680, 684 (1975); *Northwest Marine Iron Works v. United States*, 203 Ct.Cl. 629, 637, 493 F.2d 652, 657 (1974)).

 The parties contract with knowledge of the law. *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947). "[T]he parties are presumed to be aware of applicable statutes and to intend to incorporate them." 24 Corbin on Contracts § 24.26, at 273 (1998). In this regard, the law becomes a part of the contemporaneous circumstances of the contract's execution and is incorporated, without reference, into the agreement itself. *See Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 130, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) ("Laws which subsist at the time and place of the making of a contract ... enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms."); *see also* 24 Corbin on Contracts § 24.26, at 271 (noting that rules and regulations are always considered as contemporaneous circumstances). As a result, the parties are presumed to have intended to create a valid, binding contract and the court should resolve alternative interpretations of contract language so as not to void the contract. *See Torncello v. United States*, 231 Ct.Cl. 20, 27, 681 F.2d 756, 761 (1982) (citing *Arizona v. United States*, 216 Ct.Cl. at 235–36, 575 F.2d at 863); *Truong Xuan Truc v. United States*, 212 Ct.Cl. 51, 64 n. 11 (1976) (noting that a court should construe contract provisions, "if possible, to be lawful rather than unlawful" and citing *Hobbs v. McLean*, 117 U.S. 567, 576, 6 S.Ct. 870, 29 L.Ed. 940 (1886)).

 When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances for its interpretation. *See Sea–Land Serv., Inc. v. United States*, 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied*, 434 U.S. 1012,

98 S.Ct. 724, 54 L.Ed.2d 755 (1978). Construction of an unambiguous writing, therefore, is an appropriate matter for summary judgment. *See Martin v. United States*, 20 Cl.Ct. 738, 745 (1990); *Kelley v. United States*, 19 Cl.Ct. 155, 161 (1989). A written agreement is ambiguous when a plain reading of the contract could result in more than one reasonable interpretation. *See Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed.Cir.1999); *Tacoma Dept. of Pub. Utils. v. United States*, 31 F.3d 1130, 1134 (Fed.Cir.1994) (citing *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed.Cir.1992)). It is not enough that the parties differ in their interpretation of the contract clause. *See Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1578 (Fed.Cir.1993). Nor may a court look to extrinsic evidence in determining whether a contract is ambiguous. *See McAbee Constr., Inc. v. United States*, 97 F.3d at 1435; *Tacoma Dep't of Pub. Utils. v. United States*, 31 F.3d at 1134 ("Outside evidence may not be brought in to create an ambiguity where the language is clear."). However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause. *See Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972).

The parties have stated that the only issues presented for the court's resolution in the pending cross-motions for summary judgment are as follows:

1. Whether under the terms of the contract Dart was required to provide the Postal Service with up to 200,000 square feet of storage space at the Trade Center III.

2. If it is determined that the Termination for Default was improper, does the contract require the Postal Service to provide 180 days written notice of termination.

**Storage Space Requirement**

 To determine whether Dart was obligated under the contract to provide up to 200,000 square feet of storage space to the USPS for its equipment warehousing needs, the court must examine the relevant lan-

guage in the contract. The Schedule, Section A—Items and Prices, Item No. 01D, regarding guaranteed storage space states: "Guaranteed storage space day 180 to end of contract, 2 year term (see Note 1)." Accompanying Note 1 to Item No. 01D states: "Effective on the 180th day of the contract, guaranteed square footage will be 100,000 for the remainder of the contract term."

Under the plain meaning of the language of accompanying Note 1 to Item No. 01D in the original contract, Dart was required to provide the USPS with 100,000 square feet of storage space for its warehousing needs. Pursuant to Section H.6, Option Item (Clauses 2–17) [1], the USPS, however, had the right at a future date to secure an estimated 100,000 square feet of additional monthly storage space pursuant to Item Nos. 02, 08, 10, 12, or 14 in Section A of the contract (Items and Prices), depending on whether the additional storage space was to be provided during the original contract period or during one of the two-year option periods.

The Schedule, Section A—Items and Prices, Item No. 02, states: "Additional monthly storage estimated 0–100,000 sq ft (see Note 2)." Accompanying Note 2 to Item No. 02 states: "Additional monthly storage estimated at 0–100,000 Sq Ft is based on the best available information and does not constitute a guarantee. The rate must be billed only for the active floor space actually occupied by Postal Service equipment." As amended,[2] Section H.6, Option Item (Clauses 2–17) states:

> The Postal Service may require the delivery of the numbered line item identified in the Schedule as an option item, in the quantity and at the price set forth in the Schedule. The contracting officer may exercise this option, at any time within the period specified in the Schedule, by giving written notice to the contractor. Delivery of the items added by the exercise of this

option will continue immediately after, and at the same rate as, delivery of like items called for under this contract, unless the parties otherwise agree.

On February 6, 1998, the USPS issued Modification No. M01, an option "to exercise line Item 02 as additional space will be required." Modification No. M01 went on to state that: "This additional space will be provided as per contract terms. Location: 3750 Rider Trail South, Earth City MO (9 months 01–31–98 through 09–30–98)." The latter date, September 30, 1998, is the end of the original base term of the contract.

Plaintiff, Dart argues that Modification No. M01 could not have exercised Item No. 02 because Item No. 02 is not identified in the contract Schedule as an "option item," pursuant to Section H.6, Option Item (Clauses 2–17). The items identified on the Schedule page marked "Priced Option Line Items" are Item Nos. 07 to 14. Moreover, plaintiff also argues that when the defendant issued Modification No. M01, the additional space availability was exercised by the USPS only for the base contract time period ending on September 30, 1998, by the specific terms of Modification No. M01, without specifying that Modification No. M05 also was renewing or exercising the additional storage space clause for any of the two-year option periods.

In response, the USPS argues that under Item No. 01D of the contract, Dart agreed to provide the USPS with a minimum of 100,000 square feet of storage space for its equipment, which the USPS agreed to pay for whether occupied or not, and under Item No. 02, to provide the USPS with additional monthly storage estimated at 0–100,000 square feet, which the USPS only agreed to pay for as the space was occupied by USPS equipment, and which, according to the USPS, continued into the option period. The USPS also cites to contemporaneous circumstances, which it argues demonstrate that the

---

1. An option provision in a government contract generally obligates the contractor to perform the additional contract work if the government chooses to exercise the option, but does not create a legal obligation on the part of the government to exercise the option and require the work. *See Gov't Sys. Advisors, Inc. v. United States,* 847 F.2d at 813.

2. Section H.6, Option Item (Clauses 2–17) was amended on June 21, 1996 to delete the words in the first sentence "increase the quantity of supplies called for in the contract by" and to change the word "requiring" to "require."

parties considered Item No. 02 to have been extended by Modification No. M05, because, from October 1, 1998 through August 31, 1999, Dart invoiced at a rate of $.50 per square foot and the USPS paid for the guaranteed 100,000 square feet of storage space and for varying quantities above the guaranteed 100,000 square feet of storage space.

The court finds that, although not listed under the "Priced Option Line Items" section of the Schedule, but instead under the "Space" section of the contract, the plain meaning reading of the language of the words of the contract in Item No. 02 establishes this space item as making available to the USPS additional space during the base contract time period, at the option of the USPS. Furthermore, for the base contract term, by issuing Modification No. M01, pursuant to Section H.6, Option Item (Clauses 2–17), the USPS exercised the option included in Item No. 02, but specifically only for a fixed period of time, ending on September 30, 1998. Until September 30, 1998, the specified ending date identified in Modification No. M01, the court finds that Dart was required to provide the USPS with up to 100,-000 square feet of additional storage space for USPS equipment, above and beyond the 100,000 square feet of guaranteed storage space originally contracted for between the parties, for a total of up to 200,000 square feet of storage space, depending on the USPS's monthly storage requirements. Based on the express language of Modification No. M01, however, the duration of Item No. 02 was limited from January 31, 1998 until September 30, 1998. Modification No. M05 was issued on September 25, 1998, "to exercise the first two-year renewal option" for the period October 1, 1998 through September 30, 2000, and made no mention of additional storage space beyond the date of the basic contract term. Dart, therefore, is correct that Modification No. M05 only exercised the first two-year renewal option during the basic contract term, and did not specify that the additional storage space clause was renewed by Modification No. 05 for years 3–4 because the exercise by the USPS of the additional storage space availability had expired by the terms of Modification No. M01 on September 30, 1998. Al-

though the USPS could have exercised the additional storage space option in Modification No. M05, or subsequently, by executing Item No. 08, the USPS did not do so prior to terminating the contract. Because Modification No. M01 had a specific end date, September 30, 1998, for the additional storage space availability, Dart was not required to provide the USPS with up to 200,000 square feet of storage space during the two-year option renewal period.

The court also rejects the contemporaneous circumstances argument offered by the USPS. Although Dart did invoice, and the USPS did pay for, the guaranteed space and varying quantities of additional monthly space beyond September 30, 1998, Dart was not contractually required to provide the additional storage space under the terms of the contract. The fact that the USPS utilized and paid for additional space during this time does not change the words of the contract or alter the contractual responsibilities of the parties. The language in Modification No. M05 is clear: "This modification is issued to exercise the first two-year renewal option. Period covered: 10–01–98—09–30–2000." Modification No. M05 also provided: "Except as provided herein, all terms and conditions of the document referenced in Block 1 [Contract No. 266351–96–B–1696], as heretofore changed, remain unchanged and in full force and effect." The changes included in Modification No. M05 are the addition of the Termination on Notice clause and Wage Determination Charts. Modification No. M05 is silent regarding space requirements. The USPS could have opted for a storage space modification above 100,000 square feet when it exercised the first two-year option under Modification No. M05, but did not do so. Item No. 08 in the original contract specifically provided the USPS an opportunity to exercise an additional 100,000 square feet of storage space in years 3–4, but the USPS did not act to secure the additional storage space in Modification No. M05. As a result, the court concludes that the termination for default by the USPS was improper.

**Termination on Notice**

▇▇▇▇ Having concluded that the contract at issue is clear and unambiguous, and did

not require Dart to provide the USPS with up to 200,000 square feet of storage space at Trade Center III, beyond September 30, 1998, the court finds that the USPS had improperly terminated the contract with Dart for default. The Termination for Default clause in the contract provides that: "If, after termination, it is determined that the contractor was not in default ... the rights and obligations of the parties will be the same *as if* the termination had been issued for convenience." (Emphasis added.) Therefore, the improper default termination is converted to a termination for the convenience of the Postal Service by the explicit language in the Termination for Default clause. *See, generally, Murdock Mach. & Eng'g Co. v. United States,* 873 F.2d 1410, 1413 (Fed.Cir.1989); *Schlesinger v. United States,* 182 Ct.Cl. 571, 580–81 n. 5, 584–85, 390 F.2d 702, 707 n. 5, 710–11 (1968); *SIPCO Servs. & Marine Inc. v. United States,* 41 Fed.Cl. 196, 226 (1998).

■ The Termination for Convenience clause in the contract provides that: "performance under this contract may be terminated by the Postal Service in whole or in part whenever the contracting officer determines that termination is in the interest of the Postal Service." Defendant argues that this contract right on the part of the Postal Service to terminate a contract for its convenience is unaffected by the presence of a separate Termination on Notice clause, which provides in the case at issue that the contract may be terminated by either party upon 180 days advance written notice. Plaintiff, however, argues that the 180 days Termination on Notice requirement in the contract before the court modifies the Termination for Convenience clause in the contract. Plaintiff contends that the Termination on Notice clause should modify the Termination for Convenience clause because the purpose behind 180 days of notice in the Termination on Notice clause is "to allow each party sufficient advance notice of the termination of the Contract in order to make alternative arrangements and thereby minimize the economic harm caused by such a termination."

The complete Termination on Notice clause, which was added to the contract at issue in Modification No. 5, states:

> This contract may be terminated in whole or in part by either the Postal Service contracting officer or the contractor upon 180 days written notice. In the event of such termination, neither party will be liable for any costs, except for payment in accordance with the payment provisions of the contract for the actual services rendered prior to the effective date of the termination.

Therefore, the issue in a case such as the one before the court, in which an improper termination for default automatically converts to a termination for convenience, is whether the language of the Termination for Convenience clause, permitting termination on no notice, and a Termination on Notice clause, permitting termination only upon a specified number of days advance notice, can be reconciled in the same contract. As discussed above:

> provisions of a contract must be so construed as to effectuate its spirit and purpose, that it must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions, and that an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.

*Arizona v. United States,* 216 Ct.Cl. at 236, 575 F.2d at 863; *see also Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d at 322.

From the published case law, it appears that the Postal Service utilizes a variety of termination clauses in its contracts which the Postal Service Board of Contract Appeals (PSBCA) has applied to the facts of the cases under review with varying results. For example, in the case of *Tom Kime,* the USPS did not use standard Termination for Convenience and Termination for Default clauses, but issued a contract with "two alternative termination notices. The first was a thirty-day notice, similar to a termination for convenience. The other was a one-day notice, in

effect a termination for default." *Tom Kime,* PSBCA 3480, 95–1 BCA ¶ 27,490, at 136,981. The one-day default termination was upheld by the PSBCA, which wrote: "We have held that a termination provision similar to the present one gives the Contracting Officer great latitude and discretion and the election to terminate will be upheld unless it was exercised in bad faith or constitutes an abuse of discretion." *Id.* (citations omitted). In *Jaehee Yoshimoto,* PSBCA 2315, 2749, 92–1 BCA ¶ 24,504, at 122,314, a similar termination clause was reviewed, with an improper one-day termination converted to a sixty-day termination based on abuse of discretion and arbitrary action. In *On Time Postal Services, Inc.,* the PSBCA agreed with the Respondent's position that: "Appellant's [contractor's] remedy lies in the Termination clause and is limited by that clause to the payment for 60 days of service which Appellant would have received had a termination 'for convenience'—i.e., other than for default—been accomplished under that clause." *On Time Postal Servs., Inc.,* PSBCA 2528, 90–2 BCA ¶ 22,698, at 113,995. In *Cotco Leasing Company,* the contract provided for 60 days advance written notice of cancellation of the contract and in the event of cancellation the monies owed would be for the actual use of affected vehicles under the contract. The PSBCA noted that: "While the standard 'Termination for Convenience' clause is not contained in this contract, we believe the contractual right to cancel with 60–days notice is, in principle, a right which operates to the same effect." *Cotco Leasing Co.,* PSBCA 586, 81–1 BCA ¶ 14,821, at 73,156.

The contract at issue in this case between Dart and the USPS contained both the standard Termination for Convenience clause and a Termination on Notice clause. The standard Termination for Convenience clause was required by the USPS Procurement Manual, which required inclusion of "the following clauses in all fixed-price contracts not awarded using simplified procedures:[3] (1) Clause B–11, *Termination for Convenience* (2) Clause B–13, *Termination for Default* [.]"

USPS Procurement Manual, Publication 41, TL–8, paragraph B.2.1.b., July 12, 1995, incorporated by reference in USPS regulations at 39 C.F.R. § 601.100 (1996) (emphasis in original). The contract at issue was a firm fixed price contract and Clauses B–11 and B–13 were contained in the contract.

The USPS Procurement Manual states that a contracting officer may effect a termination on notice when the contract allows for such a type of termination. USPS Procurement Manual, Publication 41, TL–8, paragraph 6.9.1.d.2(a), July 12, 1995. The USPS Procurement Manual does not appear to address when a Termination on Notice clause should be used in a contract, however, the successor manual to the USPS Procurement Manual, the later 1997 USPS Purchasing Manual, provides some guidance on the use of a Termination on Notice clause for contracts subject to the 1997 USPS Purchasing Manual:

> *General.* Termination on notice is the exercise of a right to terminate a contract without further obligation. Such a right is frequently provided in certain structured contracts (see 4.6.8), particularly those requiring the performance of services or those of indefinite length. If appropriate to the particular purchase, contracting officers, with the assistance of assigned counsel, may draft and include contract clauses which provide only the Postal Service or both parties the right to terminate on notice. The clause should provide that the notice to terminate will be provided to the other party a certain number of days before the termination will occur.

USPS Purchasing Manual, Issue 1, paragraph 6.9.4.a, January 31, 1997.

The plaintiff draws the court's attention to a provision in the later 1997 USPS Purchasing Manual, not included in the earlier USPS Procurement Manual, which provides that:

> If a contract containing a termination on notice clause also contains a clause allowing for termination for default or for cause

---

**3.** The general ceiling for simplified procedures was $100,000.00, according to the 1995 USPS Procurement Manual. USPS Procurement Manual, Publication 41, TL–8, paragraph 4.3.1.b., July 12, 1995. In 1996, the contract price for the contract at issue initially was over one million dollars.

which calls for less notice than that required by the termination on notice clause, and it is subsequently established that the termination for default or cause was improper, the supplier's damages [sic] entitled will be limited to the additional amount to which the supplier would have been entitled had the termination for default or cause been a termination on notice.

USPS Purchasing Manual, Issue 1, paragraph 6.9.4.c., January 31, 1997. Defendant, in response, argues that the 1997 version of the USPS Purchasing Manual cited by plaintiff was not in effect in September, 1996 when the contract at issue in this case was executed. At the time of contract formation, the earlier USPS Procurement Manual, Publication 41, TL–8, July 12, 1995, was in effect, incorporated by reference in USPS regulations at 39 C.F.R. § 601.100 (1996). *See Abcon Assocs., Inc. v. United States,* 44 Fed. Cl. 625, 631 and 631 n. 5 (1999). The solicitation utilized in this case specifically references the earlier USPS Procurement Manual.

Modification No. M05, which added the Termination on Notice clause to the contract, is dated September 28, 1998. The USPS Purchasing Manual, Issue 1, is dated January 31, 1997. Since issuance of the later USPS Purchasing Manual predated Modification No. M05, the question is which USPS manual was effective when Modification No. M05 was executed. As to the effective date of the USPS Purchasing Manual, in spite of its date (January 31, 1997) the following instruction accompanied Issue 1 of the USPS Purchasing Manual:

The PM [Purchasing Manual] is being issued on January 31, 1997. Pending the revision and updating of purchasing support systems for consistency with this manual, purchasing organizations may adopt the policies and procedures contained herein immediately, or may follow the policies and procedures contained in the last edition of the Publication 41, Procurement Manual (Transmittal Letter 8, July 12, 1995). The Vice President, Pur-

chasing and Materials, will announce the end of this transition period by notice in the Postal Bulletin.

USPS Purchasing Manual, Issue 1, paragraph F, January 31, 1997. The guidance in the 1997 Purchasing Manual continues, that once a purchasing organization adopts the USPS Purchasing Manual, it must use it consistently for a category of purchases, and previous contract provisions and clauses used in a purchase should not be mixed with the policies and procedures of the USPS Purchasing Manual. The end of the 1997 USPS Purchasing Manual transition period was announced as January 27, 2000. At that point, all Postal Service purchasing organizations were required to use the 1997 USPS Purchasing Manual. Postal Bulletin, 22016, January 27, 2000.[4]

There is no indication in the record that the USPS Purchasing Manual was made applicable to Modification No. M05. To the contrary, Modification No. M05 itself states that: "Except as provided herein, all terms and conditions of the document referenced in Block 1 [the contract], as heretofore changed, remain unchanged and in full force and effect." The court, therefore, concludes that the originally applicable USPS Procurement Manual remained applicable when the Termination on Notice clause was added to the contract by Modification No. M05.

The earlier USPS Procurement Manual in effect in 1996 did not contain the damages limiting language quoted above from paragraph 6.9.4.c in the successor 1997 USPS Purchasing Manual, nor did it contain a separate section on Termination on Notice, as does the 1997 USPS Purchasing Manual. A contractor's damages under an improper default termination, at the relevant time, therefore, were not limited by the language in the later 1997 USPS Purchasing Manual. For purposes of the present case, therefore, the earlier, applicable USPS Procurement Manual does not require that a termination claim be limited by the amount of damages calculated pursuant to a notice provision of a Termination on Notice clause.

---

**4.** Postal Service regulations at 39 C.F.R. § 601.100 (2001) still incorporate by reference the USPS Procurement Manual, Publication 41.

Apparently, the Code of Federal Regulations has not been updated to incorporate by reference the 1997 USPS Purchasing Manual.

In support of its argument that the Termination on Notice clause modified the notice requirement of the Termination for Convenience clause, thereby requiring the USPS to provide 180 days notice or pay damages based on 180 days notice, plaintiff contends that any other interpretation of the two clauses would render the Termination on Notice clause meaningless, and would permit the USPS to avoid the requirement to give 180 days advance notice, simply by invoking the Termination for Convenience clause. Plaintiff's reasoning, however, cuts both ways. An across the board, 180 days notice requirement, as urged by the plaintiff, would subordinate the Postal Service's traditional right in a proper case to terminate for its convenience on no notice pursuant to the Termination for Convenience clause.[5] Plaintiff's interpretation effectively renders the no notice provision of the well established right to insert a standard Termination for Convenience clause into a public contract meaningless. Moreover, in the instant case, the USPS did not invoke the Termination for Convenience clause. The USPS improperly defaulted the contractor, which converted the termination for default into a termination for convenience of the USPS. As noted earlier, an interpretation which harmonizes and gives meaning to all parts of a contract is favored. *Arizona v. United States*, 216 Ct.Cl. at 236, 575 F.2d at 863. The clauses themselves, and the earlier USPS Procurement Manual applicable to the provisions of this contract, indicate that the Termination for Convenience and the Termination on Notice clauses have different purposes and can be read without rendering one of the clauses meaningless or finding that the Termination on Notice clause modifies the Termination for Convenience clause in the contract. In a contract such as the one before the court, contract termination may be accomplished under the Termination for Convenience, the Termination on Notice or the Termination for Default clauses.

Modification No. M05 was a bilateral modification to the contract, containing the signatures of both the contractor and the USPS. When Modification No. M05 added the Termination on Notice clause to the renewal contract, Modification No. M05 provided that "all terms and conditions" of the contract, "remain unchanged and in full force and effect." There is no language in Modification No. 5 indicating that the Termination for Convenience clause is modified by the addition of the Termination on Notice clause.

The earlier, applicable USPS Procurement Manual, however, provides guidance on the issue of reconciliation between the Termination for Convenience and Termination on Notice clauses. The earlier USPS Procurement Manual, in its section on Contract Termination, at paragraph 6.9.1.a.1., states that: "This section applies to contracts that contain clauses permitting termination for the convenience of the Postal Service or for contractor default, and to those contracts with clauses that provide for termination on notice." The Procurement Manual continues, at paragraphs 6.9.1.d.1. and 2., that: "1. Contracts may be terminated—whether for default, convenience, or upon notice—*only when such action is in the interest of the Postal Service.* 2. The contracting officer may effect a termination on notice ... in lieu of issuing another form of termination, upon determination that: (a) ... the contract allows termination on notice." Finally, paragraph 6.9.1.e.1.(c)(1) provides that the termination notice must state: "The type of termination contemplated and the contract clause authorizing the termination ...." USPS Procurement Manual, Publication 41, TL–8, July 12, 1995, incorporated by reference in 39 C.F.R. § 601.100 (1996) (emphasis added).[6]

**5.** For discussion of the limitations on the ability to terminate a contract under the Termination for Convenience clause, although not applicable in the present case, see *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1545 (Fed.Cir.1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997); *Salsbury Indus. v. United States*, 905 F.2d 1518, 1521–22 (Fed.Cir.1990), *cert. denied*, 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991); *Torncello v. United States*,

231 Ct.Cl. 20, 47–49, 681 F.2d 756, 772 (1982). Plaintiff has not contested the applicability of the Termination for Convenience clause, only whether its notice provisions have been modified by the Termination on Notice clause.

**6.** The 1997 USPS Purchasing Manual cited by plaintiff was not in effect at the time the original contract in question was formed although it had been issued at the time Modification No. M05

The earlier USPS Procurement Manual applicable to this contract does not indicate that the notice provided by the Termination on Notice clause modifies the Termination for Convenience clause, but instead states only that contracts may be terminated "for default, convenience, or upon notice," indicating three different ways to terminate a contract. USPS Procurement Manual, Publication 41, TL–8, paragraph 6.9.1.d.1., July 12, 1995. Furthermore, the earlier USPS Procurement Manual provided that the contracting officer is not required to use a Termination on Notice clause, but may implement the clause, rather than using another termination mechanism, so long as the clause is included in the contract. USPS Procurement Manual, Publication 41, TL–8, paragraph 6.9.1.d.2., July 12, 1995. This language treats a Termination on Notice as an additional tool of the parties, and "only when such action is in the interest of the Postal Service," rather than a mandatory limitation on damages under the Termination for Convenience clause, or as a means of effectively rendering meaningless the notice provision of the Termination for Convenience clause.

Supporting an interpretation that the Termination for Convenience and Termination on Notice clauses are different and independent ways to terminate a contract, the two clauses have different purposes and provide different rights and obligations. For example, a contractor has no authority to terminate the contract for its convenience, but can invoke the Termination on Notice clause in the contract. Under the language of the Termination for Convenience clause, a contractor settles pending matters stemming from the potentially sudden termination of its contract when longer notice, such as a 180 days notice, is not given, and submits a termination claim for its contract close out costs.[7] In contrast, the Termination on Notice clause provides that the Postal Service will not be liable for Termination for Convenience-type costs, except for actual services rendered prior to the effective date of the termination. When the Postal Service, or the contractor, desires a longer period before termination, and either party invokes the Termination on Notice clause, the longer, 180 days notice provides time for the other party to make alternative arrangements, and the Postal Service only pays for the storage space actually used during the notice period, not for any other close out costs. In sum, the two clauses provide independent ways to terminate the contract, a conclusion derived both from a reading of the two clauses and a reading of the USPS Procurement Manual. Understanding the different purposes, rights and obligations established by the two clauses gives life to both clauses, rather than resulting in rendering one clause meaningless.

was signed. As noted above, the 1997 USPS Purchasing Manual is the successor manual to the earlier USPS Procurement Manual. The general principles quoted above from the earlier USPS Procurement Manual are repeated, in similar language, in the USPS Purchasing Manual. *See* USPS Purchasing Manual, Issue 1, paragraphs 6.9.1.a.1., 6.9.1.c.1., 6.9.1.c.2.(a), and 6.9.1.d.1.(c)(1), January 31, 1997. The provision which limits damages to Termination on Notice damages in the event of an improper default is part of a new Termination on Notice section in the Contract Termination section of the later 1997 USPS Purchasing Manual and was not included in the earlier USPS Procurement Manual.

7. The Termination for Convenience clause provides for a termination claim to be submitted to the contracting officer to ameliorate possible economic harm stemming from a potentially sudden termination for the convenience of the Postal Service. If under the Termination for Convenience clause, the parties fail to agree on the amount to be paid to a contractor by reason of the termination, the Termination for Convenience clause provides that the contractor has a right of review of its termination costs under the Claims and Disputes clause, which was incorporated by reference in the contract at issue in this case. Allowable termination costs, including costs such as those continuing after termination, rental costs under unexpired leases and settlement expenses, are discussed in the USPS Procurement Manual applicable to the contract at issue. *See* USPS Procurement Manual, Publication 41, TL–8, paragraph 5.2.6, July 12, 1995; *see also White Buffalo Constr., Inc. v. United States,* 52 Fed.Cl. 1, 4–19 (2002) (discussing termination costs under the Federal Acquisition Regulation (FAR)); *Nationwide Roofing & Sheet Metal Co. v. United States,* 14 Cl.Ct. 733, 737, 1988 WL 45950 (1988) (also discussing termination costs under the FAR); *Alta Constr. Co.,* PSBCA 1463, 2920, 96–1 BCA ¶ 27,961, at 139,666–139,669 (discussing termination costs in a Postal Service contract, in which a termination for default was converted to a termination for convenience).

In *Commercial Drapery Contractors, Inc. v. United States,* a Multiple Award Schedule contract between the plaintiff and the General Services Administration (GSA) was terminated by GSA. *Commercial Drapery Contractors, Inc. v. United States,* 133 F.3d 1, 3 (D.C.Cir.1998). The contract contained a Termination on Notice-type clause which stated: "Resultant contracts may be canceled in whole or part by either party upon 30 calendar days written notice." *Id.* at 5. The contract also contained a standard Termination for Convenience clause. The plaintiff in *Commercial Drapery* argued that the Termination on Notice-type clause was inconsistent with the Termination for Convenience clause. *Id.* at 6. The court, however, read the two termination clauses in that case as not in conflict: "[T]he thirty-day notice of cancellation provision permits either party to cancel an entire multiple award schedule contract with the requisite notice, while the 'termination for convenience' provision included in most federal contracts permits either party to cancel individual orders." *Id.*

Reinforcing a difference between termination clauses, the Postal Service Board of Contract Appeals in *Interstate United Corporation* considered the contractor's request for start-up costs. The PSBCA noted that the thirty day termination clause in the contract was a Termination on Notice-type clause, and "not the standard 'Termination for Convenience' clause found in most government contracts." *Interstate United Corp.,* PSBCA 966, 82–1 BCA ¶ 15,758, *reconsideration denied,* at 77,984. The PSBCA observed that the contractor had cited a number of cases in which start-up costs were awarded. "However, those cases arose under contracts which contained the standard 'Termination for Convenience' clause which specifically provides for recovery of such costs. Thus, Appellant's [contractor's] arguments are without merit because the clause in the contract in question is substantially different." *Id.*

The Armed Services Board of Contract Appeals, in *Jarke Corporation,* also noted a significant difference between a Termination on Notice-type clause and the standard Termination for Convenience clause:

The contract involved in this appeal contained not termination for convenience clause. Nor was one required. Under the Termination by Notice provision in the contract either party could terminate the contract upon 30 days notice to the other. This was a much broader clause than the usual termination clauses in Government contracts and afforded appellant [contractor] an opportunity not generally available to a contractor.

*Jarke Corp.,* ASBCA 43509, 93–2 BCA ¶ 25,866, at 128,696 (citation omitted). *See also Guard–All of America,* ASBCA 22167, 80–2 BCA ¶ 14,462, at 71,298–71,302 (finding significant differences in a comparison of a Termination on Notice-type clause with a standard Termination for Convenience clause which the Board read into the contract); *Thomas J. Conlon,* ASBCA 44588, 93–3 BCA ¶ 26,127, at 129,877, 129,879 (reading two termination clauses so both could be meaningful, finding one clause requiring at least fifteen days notice before termination not to be in conflict with another termination clause providing for not less than thirty days as not inconsistent and requiring a minimum of thirty days advance notice of termination).

The concept that a government agency may terminate a contract for its convenience is one dating from the nineteenth century. *See Torncello v. United States,* 231 Ct.Cl. 20, 33, 681 F.2d 756, 764 (1982) (citing *United States v. Corliss Steam–Engine Co.,* 91 U.S. 321, 23 L.Ed. 397 (1875)). Over fifty years ago, the 1950 edition of the Armed Services Procurement Regulation (ASPR) made use of the Termination for Convenience clause mandatory in defense contracts over $1,000.00. John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 1074 (3d ed.1995). The Federal Procurement Regulation (FPR) followed suit, providing for a mandatory Termination for Convenience clause for contracts over certain dollar thresholds in 1967. *Id.* Similarly, the USPS Procurement Manual, applicable to the contract in this case, provides for mandatory use of the standard Termination for Convenience clause in all fixed priced contracts not awarded using simplified contracting procedures. USPS Procurement Manual, Publication 41, TL–8, paragraph B.2.1(b)(1), July 12, 1995.

In *G.L. Christian and Associates v. United States,* an Army Corps of Engineers contract omitted the standard Termination for Convenience clause, even though the ASPR required the Termination for Convenience clause in all fixed price construction contracts of more than $1,000.00. *G.L. Christian and Assocs. v. United States,* 160 Ct.Cl. 1, 11–12, 312 F.2d 418, 424, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), *reg'h denied,* 376 U.S. 929, 84 S.Ct. 657, 11 L.Ed.2d 627, 377 U.S. 1010, 84 S.Ct. 1906, 12 L.Ed.2d 1059 (1964). The United States Court of Claims held:

> We are not, and should not be, slow to find the standard termination article incorporated, as a matter of law, into plaintiff's contract if the Regulations can fairly be read as permitting that interpretation. The termination clause limits profit to work actually done, and prohibits the recovery of anticipated but unearned profits. That limitation is a deeply ingrained strand of public procurement policy. Regularly since World War I, it has been a major government principle, in times of stress or increased military procurement, to provide for the cancellation of defense contracts when they are no longer needed, as well as for the reimbursement of costs actually incurred before cancellation, plus a reasonable profit on that work—but not to allow anticipated profits.

*G.L. Christian and Assocs. v. United States,* 160 Ct.Cl. at 15, 312 F.2d at 426. The Court of Claims noted that the Termination for Convenience clause had not been applied by the parties or the court, and "it may be impossible or overly difficult at this stage to comply precisely with all the terms of the article or fully to accord with the general practice which has grown up under it." *Id.,* 160 Ct.Cl. at 17, 312 F.2d at 427. Nevertheless, the court instructed the parties to apply the Termination for Convenience clause to the claims in *G.L. Christian* as nearly as it could be reasonably applied. *Id.* A clause with such ancient lineage, reflecting deeply ingrained public procurement policy, and applied to contracts with the force and effect of law even when omitted, should not be materially modified or summarily rendered meaningless without good cause, which plaintiff has not supplied.

Under the facts and circumstances of the case brought by Dart, the USPS did not invoke the Termination on Notice clause. The Postal Service attempted to invoke the Termination for Default clause, however, the improper default termination was converted into a termination for the convenience of the Postal Service, by operation of the explicit language of the Termination for Default clause in the contract. The improper default termination was not converted to an action pursuant to the Termination on Notice clause, nor did the Termination on Notice clause modify the Termination for Convenience clause in the contract.

## CONCLUSION

In sum, the Postal Service did not terminate the contract under the Termination on Notice clause. Instead, the Postal Service attempted to terminate the contract under the Termination for Default clause. Because the termination for default has been found by the court to be improper, the termination is converted, not into one upon notice, but into a termination for the convenience of the Postal Service by the language of the Termination for Default clause. The Termination for Default and Termination for Convenience clauses in the contract at issue are mandatory clauses, required to be in the contract by the applicable USPS Procurement Manual. The explicit language of the required Termination for Default clause provides that, in the event of an improper default, the termination by the Postal Service shall be treated "as if the termination had been issued for convenience." The Termination for Default clause did not say that the termination shall be converted to a termination on notice. The USPS Procurement Manual states that contracts may be terminated "for default, convenience, or upon notice." The Termination for Default clause explicitly addresses a termination for default and one for convenience, but does not mention a termination on notice. USPS Procurement Manual, Publication 41, TL–8, paragraph 6.9.1.d.1, July 12, 1995.

Modification No. M05 added the Termination on Notice clause to the contract, but

the modification did not provide that the 180 days notice contained in that clause would modify the Termination for Convenience clause. Modification No. M05 provided instead, that all terms and conditions of the contract, including the Termination for Default clause and the Termination for Convenience clause of the contract, discussed above, "remain unchanged and in full force and effect." The rules of contract interpretation generally provide that provisions of a contract shall be given an interpretation so as to harmonize and give meaning to all provisions, that one provision will not be interpreted to render another meaningless. With this contract interpretation rule in mind, an examination of the two clauses indicates that the Termination for Convenience clause and the Termination on Notice clause, the latter added to the contract by Modification No. M05, are different, and can be read in such a way that both clauses have meaning in differing situations. The court finds that the provisions of the Termination for Convenience clause are not modified by the Termination on Notice clause. Damages, if any, shall be determined under the Termination for Convenience clause in the contract.

For the foregoing reasons, plaintiff's motion for partial summary judgment is partially **GRANTED** and defendant's motion for summary judgment in support of its default termination is **DENIED**. The termination for default by the USPS was improper, and is converted into a termination for the convenience of the Postal Service.

Furthermore, plaintiff's motion for partial summary judgment, in support of its position that the Termination for Convenience clause is modified by the Termination on Notice clause, and that the defendant was obligated to give the plaintiff 180 days written notice of termination, is **DENIED**, and the defendant's motion for partial summary judgment on the issue is **GRANTED**.

**IT IS SO ORDERED.**